UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

TERELL GILFORD,                                          :

                Petitioner,          :          13 Civ. 5881 (ALC) (AJP)

        -against-                                :          **REPORT AND RECOMMENDATION**

SUPERINTENDENT STEVEN RACETTE,          :

                Respondent.        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**ANDREW J. PECK, United States Magistrate Judge:**

**To the Honorable Andrew L. Carter, United States District Judge:**

            Pro se petitioner Terell Gilford seeks a writ of habeas corpus, pursuant to 28 U.S.C.

§ 2254, challenging his August 14, 2006 conviction following a bench trial in Supreme Court, Bronx

County, of first degree manslaughter, first degree assault, and fourth degree criminal possession of

a weapon, and his September 6, 2006 sentence to an aggregate term of twenty years imprisonment.

(Dkt. No. 1: Pet. ¶¶ 1-5; Dkt. No. 8: Sarver Aff. ¶ 7.)

            Gilford's habeas petition asserts that: (1) Gilford's attempted assault conviction was

based on legally insufficient evidence (Dkt. No. 3: Gilford Mot. to Amend at 5, modifying Pet. Br.

at 1-6);[1/] (2) consecutive identification procedures were suggestive and the resulting identification

should have been suppressed (Pet. Br. at 7-12); and (3) Gilford's trial counsel was ineffective for

failing to renew motions to dismiss the murder and assault charges (Pet. Br. at 13-14).

            For the reasons set forth below, Gilford's petition should be <u>DENIED</u>.

---

[1/]      Gilford appended a handwritten brief to his habeas corpus petition.

# FACTS

## Background

In the early morning hours of March 8, 2004, a brawl broke out at Skate Key, a Bronx nightclub and skating rink. (Ex. 2:[2] Gilford 1st Dep't Br. at 4; Ex. 3: State 1st Dep't Br. at 10, 13.) People were kicking, punching, rolling on the ground, stabbing and hitting each other with bottles. (Gilford 1st Dep't Br. at 4; State 1st Dep't Br. at 14-15.) Gary Jones and Kyle Williams were hospitalized, and James Jones died from his stab wounds. (Gilford 1st Dep't Br. at 4; State 1st Dep't Br. at 14-17.)

Sergeant Keith Walton, responding to a radio call about a stabbing at Skate Key, found James Jones, Jones' brother Deweese and Deweese's fiancée Lakeshia Cooper outside of Skate Key. (Gilford 1st Dep't Br. at 12; State 1st Dep't Br. at 4.)[3] James was on the ground with blood on his chest. (Gilford 1st Dep't Br. at 12; State 1st Dep't Br. at 4.) Cooper identified Terell Gilford as James' attacker and pointed him out among the crowd to Sgt. Walton. (Gilford 1st Dep't Br. at 12; State 1st Dep't Br. at 4-5.) Sgt. Walton and Cooper pursued Gilford on foot. (Gilford 1st Dep't Br. at 12; State 1st Dep't Br. at 6.) Responding to Sgt. Walton's call, Officers Damian Majersky and Neil Hurley stopped Gilford and arrested him. (Gilford 1st Dep't Br. at 12; State 1st Dep't Br. at 6.) Sgt. Walton instructed Officers Majersky and Hurley to take Gilford to Lincoln Hospital to conduct an emergency showup identification with James. (Gilford 1st Dep't Br. at 13; State 1st Dep't Br. at 6-7.)

---

[2] References to Exhibits are to the exhibits to the Sarver Affidavit (Dkt. No. 8).

[3] To differentiate among Deweese Jones, James Jones and Gary Jones, this Report & Recommendation will refer to them by first names. No disrespect is intended.

Hospital staff informed Officer Majersky that James was unconscious. (Gilford 1st Dep't Br. at 13; State 1st Dep't Br. at 7.) As Officer Majersky left the hospital, he encountered Deweese and Cooper. (Gilford 1st Dep't Br. at 13; State 1st Dep't Br. at 7.) After ascertaining that they knew James, Officer Majersky asked if they would be able to identify a suspect. (Gilford 1st Dep't Br. at 13-14; State 1st Dep't Br. at 7.) While Deweese and Cooper sat in one patrol car, Gilford was removed from another and presented under a spotlight, wearing handcuffs. (Gilford 1st Dep't Br. at 14; State 1st Dep't Br. at 8.) Deweese and Cooper both identified Gilford. (Gilford 1st Dep't Br. at 14; State 1st Dep't Br. at 8.)

**The Pre-Trial Suppression Hearing**[4]

Prior to trial, Gilford's counsel moved for <u>Wade</u> and <u>Huntley</u> hearings to suppress the showup identification and a statement Gilford made at the precinct. (Ex. 2: Gilford 1st Dep't Br. at 11; Ex. 3: State 1st Dep't Br. at 3.) Justice Caesar Cirigliano held the suppression hearing on July 26, 2006. (Suppression Hearing Transcript ("H.") 1.)

On March 8, 2004, at approximately 2:00 a.m., Sergeant Keith Walton received a radio call about an assault at Skate Key. (Walton: H. 9-10.) As Sgt. Walton walked toward Skate Key, an unidentified person told him someone had been stabbed. (Walton: H. 10, 25, 36-37.) Across the street from Skate Key, Sgt. Walton approached James, Deweese and Lakeshia Cooper. (Walton: H. 10-11, 24.) James was in the street, unresponsive, with blood on his chest. (Walton: H. 10-11, 17-18, 28.) Sgt. Walton called for an ambulance. (Walton: H. 18, 32, 36.) Cooper stated that James was stabbed at Skate Key, and she knew who did it. (Walton: H. 12-13, 20-21, 31.) Cooper surveyed the crowd and pointed to a black male in a green jacket, later identified as Terell

---

[4]   The transcripts for the suppression hearing and trial are contained in Dkt. No. 15.

Gilford.  (Walton: H. 12-13, 20-21, 28, 31, 59.)  Cooper and Sgt. Walton walked toward Gilford, who broke into a jog.  (Walton: H. 13, 31-32.)  Sgt. Walton and Cooper pursued Gilford on foot. (Walton: H. 14; Majersky: H. 66-67.)

Sgt. Walton made a radio transmission describing Gilford, and Officers Damian Majersky and Neil Hurley responded in a marked patrol car, joining the chase.  (Walton: H. 14; Majersky: H. 66, 79-80.)  The patrol car stopped Gilford, who resisted arrest but was subdued and cuffed by Officers Hurley and Majersky.  (Walton: H. 15; Majersky: H. 68-69.)  When Cooper arrived, she again pointed at Gilford and said he was the "one who did the stabbing in the Skate Key."  (Walton: H. 16-17.)  Sgt. Walton instructed the officers to take Gilford to Lincoln Hospital (where James had been taken) for an emergency showup.  (Walton: H. 15-16, 19-20; Majersky: H. 70, 81, 86, 89.)

Officer Majersky was told by a doctor that James was unconscious.  (Majersky: H. 71, 84.)  As Officer Majersky left the emergency room, he encountered Deweese and Cooper. (Majersky: H. 72, 74, 84-85.)  Because of their visible distress, Officer Majersky asked why they were there, and Cooper responded that their friend James had been stabbed.  (Majersky: H. 72, 84-85.)  Officer Majersky asked Cooper and Deweese if they knew anything about the events at Skate Key.  (Majersky: H. 72, 86-87, 227-28.)  When they responded that they did, Officer Majersky asked if they "would be able in any way to identify any suspects involved in the case."  (Majersky: H. 73, 91.)  Cooper and Deweese said that they could.  (Majersky: H. 73.)

Officer Majersky called for a second patrol car and placed Cooper and Deweese in it.  (Majersky: H. 73, 93, 228.)  The vehicle's turret light was directed at the car holding Gilford. (Majersky: H. 73, 228-29.)  At Officer Majersky's signal, Officer Hurley removed Gilford, who was

rear-cuffed, from the car.  (Majersky: H. 74-75.)  Cooper and Deweese identified Gilford as the suspect.  (Majersky: H. 74-75, 95-96, 228.)  After the identification procedure, Officer Majersky brought Cooper and Deweese into the hospital for further questioning.  (Majersky: H. 76.)  Cooper stated that Gilford stabbed James in a confrontation at Skate Key.  (Majersky: H. 97.)  Deweese stated that there was a fight at Skate Key and he saw Gilford holding a knife.  (Majersky: H. 101.)  Officer Majersky did not separate Cooper and Deweese during the identification procedure or questioning.  (Majersky: H. 94-95.)

Gilford was patted down when he was arrested and searched at the precinct, and no contraband was recovered from him.  (Majersky: H. 97-101.)  On March 8, 2004, Detective Ortiz interviewed Gilford at the precinct.  (Ortiz: H. 114.)  Gilford gave a statement admitting that he was part of the brawl at Skate Key, and that during the fight someone handed him an open knife that he swung "wildly" approximately seven times, hitting someone three times.  (Ortiz: H. 123-25.)  Gilford's counsel conceded that Gilford's Miranda warnings were properly administered, and that his videotaped statement was made voluntarily.  (H. 120, 249-50.)

### Justice Cirigliano's Decision

Justice Cirigliano denied Gilford's suppression motions.  (Ex. 1: 8/1/06 Order.)  As to the showup identification, Justice Cirigliano concluded:

> The acts of the police officer in arranging a show-up identification at Lincoln Hospital with witnesses that were present at the crime scene, amounts to an act of preservation of the witnesses' "fresh memories" of the event and therefore both identifications by Ms. Cooper and Mr. Deweese Jones are justified and hence admissible.

(8/1/06 Order at 7.)  Justice Cirigliano held that presenting Gilford in front of a police car while wearing handcuffs did not render the showup unduly suggestive.  (Id.)  Justice Cirigliano further

held that Gilford was properly advised of his <u>Miranda</u> rights, and his statement thus was admissible at trial.  (<u>Id.</u>)

**Gilford's Trial**

On August 1, 2006, Gilford proceeded to a bench trial before Justice Cirigliano. (Dkt. No. 15: Trial Transcript ("Tr.") 1, 2-3.)

### The People's Case

### The Fight at Skate Key

Lakeshia Cooper knew Deweese as a teenager, dated him intermittently, and had a daughter with him in 1998.  (Cooper: Tr. 531-32.)  When Cooper and Deweese's daughter was born, they were no longer dating and Deweese was in jail.  (Cooper: Tr. 532.)  During Deweese's incarceration, Cooper began dating William Askew. (Cooper: Tr. 532-33.)  After two years, Cooper ended her relationship with Askew and again dated Deweese.  (Cooper: Tr. 533-34.)  At some point after Cooper and Deweese began dating again, Deweese and Askew confronted each other outside of Cooper's residence.  (Cooper: Tr. 534.)

On March 8, 2004, at approximately 1:15 a.m., a group of friends and relatives including Cooper, Deweese, Deweese's uncle Gary and his relative Kyle Williams, went to Skate Key in the Bronx.  (Williams: Tr. 49-50; G. Jones: Tr. 215-17, 289; Cooper: Tr. 525-26.)  Deweese's brother James arrived later in the evening.  (Cooper: Tr. 527-28.)  It was "[g]rown up night" at Skate Key, and only adults over the age of twenty-three were admitted.  (G. Jones: Tr. 237-38.)  Entrants to Skate Key walked through a magnetometer, but were admitted even if it alerted for metal. (Williams: Tr. 50-51; G. Jones: Tr. 215-16; Cooper: Tr. 525.)

While the group was socializing, drinking and dancing, Cooper told Gary that she saw her ex-boyfriend Askew nearby and he frightened her.  (G. Jones: Tr. 217-18; Cooper: Tr. 528-29.)  Askew approached Cooper, grabbing her by the neck or shoulder.  (Williams: Tr. 56; G. Jones: Tr. 218-19, 317; Cooper: Tr. 530.)  Seeing this, Gary either pushed or punched Askew, who fell to the ground.  (Williams: Tr. 56; G. Jones: Tr. 219, 303; Cooper: Tr. 636-37.)  Everyone around laughed at Askew when he fell.  (Cooper: Tr. 537, 637-38.)  At some point, Gilford intervened and said that because they were all from Harlem there should be no problem.  (Williams: Tr. 52, 54-56, 162, 168; Cooper: Tr. 539, 656-57.)  Askew's friends helped him up and back to the bar.  (Cooper: Tr. 537, 643.)

A few minutes later, Gilford, Askew and other individuals returned to the dance floor and began arguing with Deweese, Williams, Gary and James.  (Cooper: Tr. 538-40, 542, 656.)  The dance floor separated around the two groups of people, as "all hell broke lo[o]se."  (Williams: Tr. 56-58, 177.)  People rolled on the floor fighting "like cats and dogs."  (Williams: Tr. 58.)  When Gilford's friend hit Deweese, James came to his brother's defense.  (Cooper: Tr. 543-44, 659-60.)  Gilford came to his friend's defense and began fighting with James.  (Cooper: Tr. 543-44, 660-61.)  Cooper, who was right beside James (Cooper: Tr. 602, 649), observed that he was "whipping [Gilford's] ass" until Gilford stabbed him in the side (Cooper: Tr. 543-45, 553-54, 649, 660-62, 675-76).  As Cooper pulled James out of the fight, Gilford stabbed him again, in the chest.  (Cooper: Tr. 545, 649, 666-67, 675-76.)  Cooper estimated that Gilford's knife was ten or eleven inches long.  (Cooper: Tr. 553.)

Williams and Gary were fighting with others.  (Williams: Tr. 58-59, 177-78; G. Jones: Tr. 221-22.)  Williams was stabbed in the back three times.  (Williams: Tr. 189-90.)  Skate

Key bouncers extracted Williams from the fight, took him to the exit and instructed him to leave. (Williams: Tr. 59-60, 178-79.)  Instead, Williams turned to look for his friends, but as he did so Gilford approached, said "I'm gonna poke you" and lunged at him with a knife.  (Williams: Tr. 59-61, 180-83.)  Williams recognized Gilford from the parole office.  (Williams: Tr. 53, 163.)  Gilford stabbed Williams and ran out the door.  (Williams: Tr. 59, 61-62.)  Williams told the Skate Key bouncers that he had been stabbed, and they called an ambulance.  (Williams: Tr. 62, 205.) Williams told the bouncers, the police and hospital staff that he did not know who stabbed him, but testified that he did so only because he intended to "handle it [his] own way." (Williams: Tr. 62-63, 163-66, 209.)

At some point during the brawl, Gilford approached Gary with a knife, and threatened to "poke" him as well.  (G. Jones: Tr. 222, 299-302.)  As Gilford approached, Gary was hit over the head with a bottle and fell down.  (G. Jones: Tr. 222-23, 302.)  Cooper observed Askew hit Gary over the head with a champagne bottle as she was helping James toward the exit.  (Cooper: Tr. 545, 649, 650, 668.)

Cooper and James left Skate Key, crossed the street and Cooper lifted James' shirt to inspect his wounds.  (Cooper: Tr. 546.)  Cooper saw a wound on James' side and a wound on his chest "gushing" blood.  (Cooper: Tr. 546.)  James collapsed and said he was dying.  (Cooper: Tr. 546-47, 549, 671.)  Deweese, Gary and Williams also exited Skate Key and stood around James. (Cooper: Tr. 546, 547, 671.)  Cooper observed that Gary and Williams also were bleeding.  (Cooper: Tr. 547, 549.)  Gary received twenty stitches in his scalp, and five stitches in his arm.  (G. Jones: Tr. 231-32, 270, 305.)  Williams was hospitalized for three days after the fight due to internal bleeding, three puncture wounds in his back and one puncture wound in his abdomen.  (Williams:

Tr. 67-70.)   Williams was readmitted to Lincoln Hospital a week after his release for treatment of a related internal infection.  (Williams: Tr. 74.)

### Police Response To The Fight At Skate Key

Sergeant Keith Walton was nearby, received a radio transmission about an assault inside Skate Key, and was told by an unidentified individual that someone had been stabbed. (Walton: Tr. 402.)  Sgt. Walton walked toward Skate Key and found James laying in the street, unresponsive, with Cooper and two males beside him.  (Walton: Tr. 403-04.)  Cooper told Sgt. Walton that she knew who stabbed James.  (Walton: Tr. 404; Cooper: Tr. 548.)  Cooper turned and saw Gilford in a green jacket walking away, pointed and began to chase him.  (Walton: Tr. 404; Cooper: Tr. 547-48, 672, 674.)  Sgt. Walton joined the chase, transmitted a radio request for assistance, and Officers Damian Majersky and Neil Hurley responded in a marked police car. (Walton: Tr. 405-07.)  Officers Majersky and Hurley tried to cut in front of Gilford, but he evaded them and kept running.  (Majersky: Tr. 370; Walton: Tr. 407.)  Gilford resisted arrest, but ultimately was apprehended.  (Majersky: Tr. 371-72; Walton: Tr. 408.)  Sgt. Walton never lost sight of Gilford during the chase.  (Walton: Tr. 406-07.)

### Emergency Showup At Lincoln Hospital

After Gilford was arrested, Sgt. Walton instructed Officers Majersky and Hurley to take Gilford to Lincoln Hospital for an emergency showup identification with the victim, James Jones.  (Walton: Tr. 408; Majersky: Tr. 373.)  Told by emergency room staff that James was unconscious in the operating room, Officer Majersky left the hospital, and encountered Deweese and Cooper in the parking lot.  (Majersky: Tr. 374-76.)  Because they "looked distraught," Officer Majersky asked why they were there, and when they told him, he asked them if he could show them

someone.  (Makersky: Tr. 375-76, 379.)  Cooper and Deweese were placed in the back of a police car and Gilford was exhibited to them under high beam lights. (Cooper: Tr. 555.)  Cooper and Deweese both identified Gilford, who Officer Majersky placed under arrest.  (Cooper: Tr. 556; Majersky: Tr. 380.)

On March 8, 2004, Detective Edwin Ortiz interviewed Gilford, who made an oral statement which said in relevant part that during the fight someone handed him an open flip knife with a black handle and silver blade and pocket clip, that he swung about "'wildly'" approximately seven times, hitting (i.e., cutting) someone about three times while he tried to escape the fight. (Ortiz: Tr. 690-94, 709.)

### Medical and Forensic Evidence

Detective Matthew Steiner recovered three blood samples and a folding knife with an approximately three inch blade from the crime scene.  (Steiner: Tr. 93-96, 117-18.)

Dr. Monica Smiddy performed the autopsy on James, and determined that he had stab wounds to his chest, right forearm and right hand.  (Smiddy: Tr. 324-26.)  The wounds to James' chest and right forearm were approximately four to six inches deep, and the wound to his hand was superficial.  (Smiddy: Tr. 326-27, 330, 344, 346.)  Dr. Smiddy identified James' chest wound as fatal.  (Smiddy: Tr. 329.)  Dr. Smiddy did not believe that the flip knife recovered from the crime scene could have caused James' chest and forearm wounds, because it had a serrated edge, although it might have caused the wound to his hand.  (Smiddy: Tr. 344-46.)

Forensic Scientist Mark Desire analyzed James' postmortem blood and hair samples, the knife recovered from the crime scene, blood samples collected at the crime scene and blood samples found on Gilford's clothing.  (Desire: Tr. 423-25.)  Desire matched two blood stains on

Gilford's undershirt with James' DNA profile.  (Desire: Tr. 442-46, 456-58.)  Desire determined that the stains on the recovered knife were not human blood.  (Desire: Tr. 449.)

Dr. Luis Maciera-Rodriguez supervised the treatment Gary and Williams received at Lincoln Hospital on March 8, 2014.  (Maciera-Rodriguez: Tr. 472, 476-77, 481.)  Dr. Maciera-Rodriguez testified that Gary had a laceration in his head six inches long and down to his skull, and a stab wound on his left forearm.  (Maciera-Rodriguez: Tr. 477-78.)  Dr. Marciera-Rodriguez testified that Williams had stab wounds to his right upper back and left lower abdomen.  (Maciera-Rodroguez: Tr. 481, 484.)  Williams' back injuries caused a hemopneumothorax, a collapse of the lung with blood pooling in the lung cavity.  (Maciera-Rodrogiez: Tr. 481.)  The wound to Williams' abdomen was not deep, but the risks of a deeper wound to the same area included injuries to the bowel, spleen and sigmoid, as well as contamination of the belly, sepsis, shock and death.  (Maciera-Rodriguez: Tr. 482, 485.)

### Gilford's Case

#### Deweese Jones' Testimony

Deweese was at the deejay booth when the fight began.  (D. Jones: Tr. 878, 915.) Deweese saw his brother James fighting with someone in a green or gray flight jacket.  (D. Jones: Tr. 916-17.)  When Deweese came down into the crowd, the "commotion was already going on." (D. Jones: Tr. 879, 916-18.)  Deweese saw his uncle Gary wiping blood off his face and helped him exit the club.  (D. Jones: Tr. 879-80, 918.)  As Deweese assisted his uncle, he saw the bouncers escort Williams outside.  (D. Jones: Tr. 918.)  Deweese saw Cooper and his brother James outside of Skate Key.  (D. Jones: Tr: 880, 919.)  James stated that he had been stabbed.  (D. Jones: Tr. 880, 919.)  Cooper told Deweese, "I think he got stabbed."  (D. Jones: Tr. 883-84.)

After the fight, Cooper told Deweese facts about her relationship with Askew that explained "why that night happened." (D. Jones: Tr. 924, 927.) Although Cooper and Deweese were engaged to be married as of March 8, 2004, the fight was "the end of it" between them. (D. Jones: Tr. 924-25.)

### Gilford's Motions

At the close of the prosecution's case, Gilford's counsel moved to dismiss count seven of the indictment (first degree assault, acting in concert as to Gary Jones), count nine (acting in concert, knife possession), as well as the second degree murder charge, the second degree assault charge as to Gary Jones, and the bottle possession charge. (Tr. 731-43.) Justice Cirigliano denied the motion. (Tr. 743-44.)

At the close of all the evidence, Gilford's counsel moved to dismiss: (1) the intentional and depraved indifference murder charges as to James; (2) the second degree manslaughter charge as to James; (3) the attempted murder charge as to Williams; and (4) the criminal possession charge. (Tr. 949-59.) The prosecution agreed to dismiss the charges of depraved indifference murder and criminal possession of a weapon as to the bottle. (Tr. 953, 961.) Justice Cirigliano denied the motion. (Tr. 958, 961.)

### Gilford's Summation

Gilford's counsel's summation emphasized the differences between the knife described by Gilford to the police and recovered at the scene, and the instrument that the medical expert testified could have caused the deep, clean-edged wound that killed James and deeply penetrated Williams' back. (Tr. 970-73.) Gilford's counsel argued that the evidence was insufficient to prove that Gilford caused Williams' serious back wounds, and insufficient to prove that Williams'

stomach wound was a serious injury.  (Tr. 1010.)   Gilford's counsel also highlighted the inconsistencies and inaccuracies in Cooper's testimony.  (Tr. 981, 1015-22.)

### The Prosecution's Summation

The prosecution relied on Cooper's eyewitness testimony that when James began "getting the better of" him, Gilford evened the score by stabbing James.  (Tr. 1035-36.)  The prosecution emphasized the immediacy of Cooper's reaction, arguing that she was credible because she had no time to reflect between leaving Skate Key and spotting Gilford on the street.  (Tr. 1036-39.)

### Verdict & Sentence

On August 14, 2006, Justice Cirigliano convicted Gilford of one count of first degree manslaughter as to James, one count of first degree assault against Williams, and one count of fourth degree criminal possession of a weapon (the knife).  (Tr. 1066-68.)

On September 6, 2006, before sentencing, Gilford's counsel moved to set aside the verdict on the manslaughter count, arguing that Cooper was wrong because Gilford's knife was too small to cause James' wounds.  (Dkt. No. 16: Sentencing Tr. ("S.") at 2-3.)  Gilford's counsel also moved to set aside the verdict on the assault charge, on the ground that Williams' stomach wound was not "serious."  (S. 4.)  Justice Cirigliano denied the motion.  (S. 7-9.)  Justice Cirigliano sentenced Gilford to concurrent sentences of twenty years for manslaughter, twenty years for assault, and one year for weapon possession.  (S. 28.)

### Gilford's Direct Appeal

Represented by the Office of the Appellate Defender, Gilford's direct appeal to the First Department argued that: (1) the evidence was legally insufficient to support Gilford's assault

conviction, and his assault conviction was against the weight of the evidence (Ex. 2: Gilford 1st Dep't Br. at 44-58); (2) Gilford's manslaughter conviction was against the weight of the evidence (Gilford 1st Dep't Br. at 59-73); (3) the identification procedures were suggestive and the identifications should have been suppressed (Gilford 1st Dep't Br. at 74-91); and (4) Gilford's sentence was excessive (Gilford 1st Dep't Br. at 92-97).

The First Department upheld Gilford's manslaughter conviction (since the trial court found Cooper credible).  People v. Gilford, 65 A.D.3d 840, 840-41, 884 N.Y.S.2d 731, 732 (1st Dep't 2009).  As to the identification testimony, the First Department found that the trial court properly denied Gilford's motion to suppress because "the showup was within permissibly close temporal and geographic proximity to the crime, took place shortly after the witness had already made a reliable identification, and was conducted in a manner that was not unduly suggestive." People v. Gilford, 65 A.D.3d at 841-42, 884 N.Y.S.2d at 733 (citations omitted).

The First Department noted that Gilford's claim as to the assault conviction was unpreserved, but nevertheless reviewed it "in the interest of justice."  People v. Gilford, 65 A.D.3d at 841, 884 N.Y.S.2d at 732.  The First Department held:

> While there is no evidence to support any theory under which defendant would be criminally liable for the deep and dangerous wounds to [Williams'] back, the evidence is legally sufficient to establish that defendant, confronting the victim and threatening to "poke" him, thrust a knife into his abdomen.  However, the abdominal wound was superficial, did not damage any internal organs, and did not constitute serious physical injury.

People v. Gilford, 65 A.D.3d at 841, 884 N.Y.S.2d at 732 (citations omitted).  As such, the First Department reduced Gilford's first degree assault conviction to first degree attempted assault, and reduced that sentence to ten years.  People v. Gilford, 65 A.D.3d at 840, 841, 884 N.Y.S.2d at 732.

Except as to the assault conviction, the First Department found no basis for reducing Gilford's sentence.  People v. Gilford, 65 A.D.3d at 842, 884 N.Y.S.2d at 733.

On May 17, 2010, the New York Court of Appeals granted Gilford's application for leave to appeal.  (Ex. 5: 5/17/10 Order.)  People v. Gilford, 14 N.Y.3d 888, 903 N.Y.S.2d 776 (2010).  Still represented by the Officer of the Appellate Defender, Gilford argued to the New York Court of Appeals that: (1) Cooper's identification testimony should have been suppressed as the showup procedure was unnecessary and highly suggestive (Ex. 6: Gilford N.Y. Ct. App. Br. at 29-51); and (2) the First Department erred in reducing Gilford's conviction to first degree attempted assault when there was no evidence that Gilford intended to cause serious physical injury to Williams (Gilford N.Y. Ct. App. Br. at 52-55).

The New York Court of Appeals held that "[w]hether a showup is reasonable under the circumstances and/or unduly suggestive are mixed questions of law and fact.  As a result, the determination of the hearing court in this case, undisturbed by the Appellate Division and supported by evidence in the record, is beyond our further review."  People v. Gilford, 16 N.Y.3d 864, 868, 924 N.Y.S.2d 314, 316 (2011).  The Court of Appeals found unpreserved Gilford's claim that the evidence was insufficient to show his intent to cause serious physical injury to Williams.  People v. Gilford, 16 N.Y.3d at 868, 924 N.Y.S.2d at 316.

**Gilford's C.P.L. § 440 Motion**

On November 18, 2011, Gilford filed a pro se C.P.L. § 440.10 motion asserting that the prosecution's case at trial "constituted an improper change of theory" from the grand jury presentation, and as such his trial counsel was ineffective for failing "to seek dismissal of those counts of the indictment charging murder and assault first degree relating to Jones and Williams on

the grounds that the prosecution had intentionally presented false and misleading evidence before the grand jury. . . ."  (Ex. 9: Gilford § 440 Aff. ¶¶ 22-23.)

On August 10, 2012, Justice Cirigliano held that Gilford's motion was procedurally barred by C.P.L. § 440.10(2)(c) for his failure to raise his claims on direct appeal.  (Ex. 11: 8/10/12 Order.)  On September 24, 2012, Gilford moved to renew or reargue his C.P.L. § 440.10 motion.  (Ex.15: Gilford Motion & Aff.)  On December 10, 2012, Justice Cirigliano denied Gilford's motion.  (Dkt. No. 8: Sarver Aff. ¶ 14.)

On March 12, 2013, the First Department denied Gilford's application for leave to appeal holding that "there is no question of law or fact presented which ought to be reviewed" by the First Department.  (Ex. 14: 3/12/13 Order.)

**Gilford's Federal Habeas Corpus Petition**

On August 20, 2013, Gilford filed his pro se federal habeas corpus petition arguing that: (1) his manslaughter conviction was against the weight of the evidence (Dkt. No. 1: Pet. Br. at 1-6); (2) the identification procedures were suggestive and the resulting identifications should have been suppressed (Pet. Br. at 7-12); and (3) his trial counsel was ineffective for failing to renew motions to dismiss the murder and assault charges (Pet. Br. at 13-14).  On December 27, 2013, Gilford submitted a motion requesting that his weight of the evidence claim be withdrawn, and his petition amended to add a claim that the evidence was insufficient to support his conviction for first degree assault.  (Dkt. No. 3: Gilford Mot. to Amend.)

## ANALYSIS

### I.   THE AEDPA REVIEW STANDARD

Before the Court can determine whether petitioner is entitled to federal habeas relief, the Court must address the proper habeas corpus review standard under the Antiterrorism and Effective Death Penalty Act ("AEDPA").

In enacting the AEDPA, Congress significantly "modifie[d] the role of federal habeas courts in reviewing petitions filed by state prisoners." Williams v. Taylor, 529 U.S. 362, 403, 120 S. Ct. 1495, 1518 (2000). The AEDPA imposed a more stringent review standard, as follows:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> (2)  . . . was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).[5]

---

[5]   See also, e.g., Cullen v. Pinholster, 131 S. Ct. 1388, 1398 (2011); Knowles v. Mirzayance, 556 U.S. 111, 121, 129 S. Ct. 1411, 1418 (2009); Evans v. Fischer, 712 F.3d 125, 132 (2d Cir.), cert. denied, 134 S. Ct. 238 (2013); Portalatin v. Graham, 624 F.3d 69, 78-79 (2d Cir. 2010) (en banc), cert. denied, 562 U.S. 1303, 1304, 131 S. Ct. 1691, 1693 (2011); Henry v. Poole, 409 F.3d 48, 67 (2d Cir. 2005), cert. denied, 547 U.S. 1040, 126 S. Ct. 1622 (2006); Howard v. Walker, 406 F.3d 114, 121-22 (2d Cir. 2005); Cox v. Donnelly, 387 F.3d 193, 197 (2d Cir. 2004); Dallio v. Spitzer, 343 F.3d 553, 559-60 (2d Cir. 2003), cert. denied, 541 U.S. 961, 124 S. Ct. 1713 (2004); Eze v. Senkowski, 321 F.3d 110, 120 (2d Cir. 2003) ("AEDPA changed the landscape of federal habeas corpus review by 'significantly curtail[ing] the power of federal courts to grant the habeas petitions of state prisoners.'" (quoting Lainfiesta v. Artuz, 253 F.3d 151, 155 (2d Cir. 2001), cert. denied, 535 U.S. 1019,
(continued...)

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have "independent meaning." Williams v. Taylor, 529 U.S. at 404-05, 120 S. Ct. at 1519.[6] Both, however, "restrict[] the source of clearly established law to [the Supreme] Court's jurisprudence." Williams v. Taylor, 529 U.S. at 412, 120 S. Ct. at 1523.[7] The relevant Supreme Court jurisprudence

---

[5]      (...continued)
122 S. Ct. 1611 (2002))).

[6]      Accord, e.g., Evans v. Fischer, 712 F.3d at 132-33; Henry v. Poole, 409 F.3d at 68; Howard v. Walker, 406 F.3d at 122; Parsad v. Greiner, 337 F.3d 175, 181 (2d Cir.), cert. denied, 540 U.S. 1091, 124 S. Ct. 962 (2003); Jones v. Stinson, 229 F.3d 112, 119 (2d Cir. 2000); Lurie v. Wittner, 228 F.3d 113, 125 (2d Cir. 2000), cert. denied, 532 U.S. 943, 121 S. Ct. 1404 (2001); Clark v. Stinson, 214 F.3d 315, 320 (2d Cir. 2000), cert. denied, 531 U.S. 1116, 121 S. Ct. 865 (2001).

[7]      Accord, e.g., Woods v. Donald, 135 S. Ct. 1372, 1376 (2015); Marshall v. Rodgers, 133 S. Ct. 1446, 1447 (2013) (per curiam); Lafler v. Cooper, 132 S. Ct. 1376, 1390 (2012) ("A decision is contrary to clearly established law if the state court 'applies a rule that contradicts the governing law set forth in [Supreme Court] cases.'"); Howes v. Fields, 132 S. Ct. 1181, 1187 (2012) ("In this context, 'clearly established law' signifies 'the holdings, as opposed to the dicta, of [the Supreme] Court's decisions.'"); Carey v. Musladin, 549 U.S. 70, 77, 127 S. Ct. 649, 654 (2006) ("Given the lack of holdings from this Court regarding [this issue], it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'"); Yarborough v. Alvarado, 541 U.S. 652, 661, 124 S. Ct. 2140, 2147 (2004) ("We look for 'the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.'"); Wiggins v. Smith, 539 U.S. 510, 519, 123 S. Ct. 2527, 2534 (2003); Lockyer v. Andrade, 538 U.S. 63, 71, 123 S. Ct. 1166, 1172 (2003) ("Section 2254(d)(1)'s 'clearly established' phrase 'refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'"); Assadourian v. Brown, 493 F. App'x 223, 225 (2d Cir. 2012) ("[H]abeas relief is only warranted where a state court unreasonably applies clearly established Supreme Court law . . . ."); Portalatin v. Graham, 624 F.3d at 79 ("To qualify as 'clearly established' for the purposes of federal habeas review, a rule of law must be embodied in the 'holdings, as opposed to the dicta,' of Supreme Court precedent."); Georgison v. Donelli, 588 F.3d 145, 153-54 (2d Cir. 2009); Dunlap v. Burge, 583 F.3d 160, 164 (2d Cir.), cert. denied, 558 U.S. 1037, 130 S. Ct. 642 (2009); Hargett v. Giambruno, 291 F. App'x 402, 403 (2d Cir. 2008); Howard v. Walker, 406 F.3d at 122; Tueros v. Greiner, 343 F.3d 587, 591 (2d Cir. 2003), cert. denied, 541 U.S. 1047, 124 S. Ct. 2171 (2004); Yung v. Walker, 341 F.3d 104, 109-10
(continued...)

is that in effect at the time of the state court's adjudication on the merits (in New York, usually the decision of the Appellate Division), not at the time of a subsequent decision (e.g., the New York Court of Appeals) denying leave to appeal.  Greene v. Fisher, 132 S. Ct. 38, 44-45 (2011); accord, e.g., Jackson v. Conway, 763 F.3d 115, 134 (2d Cir. 2014), cert. denied, 135 S. Ct. 1560 (2015).

"That federal law, as defined by the Supreme Court, may be either a generalized standard enunciated in the [Supreme] Court's case law or a bright-line rule designed to effectuate such a standard in a particular context." Kennaugh v. Miller, 289 F.3d at 42.[8] "A petitioner can not win habeas relief solely by demonstrating that the state court unreasonably applied Second Circuit precedent." Yung v. Walker, 341 F.3d at 110; accord, e.g., Parker v. Matthews, 132 S. Ct. 2148, 2155 (2012) ("[C]ircuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court.' It therefore cannot form the basis for habeas relief under AEDPA." (citation omitted)); DelValle v. Armstrong, 306 F.3d at 1200.[9]

---

[7]     (...continued)
(2d Cir. 2003); Parsad v. Greiner, 337 F.3d at 181; DelValle v. Armstrong, 306 F.3d 1197, 1200 (2d Cir. 2002); Kennaugh v. Miller, 289 F.3d 36, 42 (2d Cir.), cert. denied, 537 U.S. 909, 123 S. Ct. 251 (2002); Loliscio v. Goord, 263 F.3d 178, 184 (2d Cir. 2001); Sellan v. Kuhlman, 261 F.3d 303, 309 (2d Cir. 2001).

[8]     Accord, e.g., Marshall v. Rodgers, 133 S. Ct. at 1449 ("[T]he lack of a Supreme Court decision on nearly identical facts does not by itself mean that there is no clearly established federal law, since 'a general standard' from this Court's cases can supply such law."); Davis v. Grant, 532 F.3d 132, 140 (2d Cir. 2008), cert. denied, 555 U.S. 1176, 129 S. Ct. 1312 (2009).

[9]     See also, e.g., Glebe v. Frost, 135 S. Ct. 429, 431 (2014) ("As we have repeatedly emphasized, however, circuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court.'"); White v. Woodall, 134 S. Ct. 1697, 1702 & n.2 (2014) ("Clearly established Federal law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of [the Supreme] Court's decisions . . . . [A] lower court
(continued...)

As to the "contrary to" clause:

> A state-court decision will certainly be contrary to [Supreme Court] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases. . . .   A state-court decision will also be contrary to [the Supreme] Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.

Williams v. Taylor, 529 U.S. at 405-06, 120 S. Ct. at 1519-20.[10/]

---

[9/]   (...continued)
may not consult its own precedents rather than those of [the Supreme] Court, in assessing a habeas claim governed by § 2254." (quotations omitted)); Marshall v. Rodgers, 133 S. Ct. at 1450-51 ("Although an appellate panel may, in accordance with its usual law-of-the-circuit procedures, look to circuit precedent to ascertain whether it has already held that the particular point in issue is clearly established by Supreme Court precedent, it may not canvass circuit decisions to determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to this Court, be accepted as correct." (citations omitted)).

[10/]   Accord, e.g., Lafler v. Cooper, 132 S. Ct. at 1390; Cullen v. Pinholster, 131 S. Ct. at 1398; Knowles v. Mirzayance, 556 U.S. at 122, 129 S. Ct. at 1419 (The Supreme "Court has held on numerous occasions that it is not 'an unreasonable application of clearly established federal law' for a state court to decline to apply a specific legal rule that has not been squarely established by this [Supreme] Court." (quotation omitted)); Brown v. Payton, 544 U.S. 133, 141, 125 S. Ct. 1432, 1438-39 (2005); Bell v. Cone, 543 U.S. 447, 452-53, 125 S. Ct. 847, 851 (2005); Price v. Vincent, 538 U.S. 634, 640, 123 S. Ct. 1848, 1853 (2003); Lockyer v. Andrade, 538 U.S. at 73-74, 123 S. Ct. at 1173-74; Evans v. Fischer, 712 F.3d at 132; Portalatin v. Graham, 624 F.3d at 79; Bierenbaum v. Graham, 607 F.3d 36, 47-48 (2d Cir. 2010), cert. denied, 562 U.S. 1303, 131 S. Ct. 1693 (2011); Ortiz v. N.Y.S. Parole in Bronx, N.Y., 586 F.3d 149, 156 (2d Cir. 2009), cert. denied, 562 U.S. 955, 131 S. Ct. 320 (2010); Dunlap v. Burge, 583 F.3d at 164; Davis v. Grant, 532 F.3d at 140; Hawkins v. Costello, 460 F.3d 238, 242 (2d Cir. 2006), cert. denied, 549 U.S. 1215, 127 S. Ct. 1267 (2007); Henry v. Poole, 409 F.3d at 68; Howard v. Walker, 406 F.3d at 122; Rosa v. McCray, 396 F.3d 210, 219 (2d Cir.), cert. denied, 546 U.S. 889, 126 S. Ct. 215 (2005); Tueros v. Greiner, 343 F.3d at 591; Yung v. Walker, 341 F.3d at 109; DelValle v. Armstrong, 306 F.3d at 1200; Kennaugh v. Miller, 289 F.3d at 42; Loliscio v. Goord, 263 F.3d at 184; Lurie v. Wittner, 228 F.3d at 127-28.

In <u>Williams</u>, the Supreme Court explained that "[u]nder the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." <u>Williams</u> v. <u>Taylor</u>, 529 U.S. at 413, 120 S. Ct. at 1523.[11/] However, "[t]he term 'unreasonable' is . . . difficult to define." <u>Williams</u> v. <u>Taylor</u>, 529 U.S. at 410, 120 S. Ct. at 1522. The Supreme Court made clear that "an <u>unreasonable</u> application of federal law is different from an <u>incorrect</u> application of federal law." <u>Id.</u>[12/] Rather, the issue is "whether the state court's

---

[11/]   <u>Accord</u>, <u>e.g.</u>, <u>Cullen</u> v. <u>Pinholster</u>, 131 S. Ct. at 1399; <u>Waddington</u> v. <u>Sarausad</u>, 555 U.S. 179, 190, 129 S. Ct. 823, 831 (2009); <u>Brown</u> v. <u>Payton</u>, 544 U.S. at 141, 125 S. Ct. at 1439; <u>Wiggins</u> v. <u>Smith</u>, 539 U.S. at 520, 123 S. Ct. at 2534-35; <u>Jackson</u> v. <u>Conway</u>, 763 F.3d at 134-35; <u>Evans</u> v. <u>Fischer</u>, 712 F.3d at 133; <u>Bierenbaum</u> v. <u>Graham</u>, 607 F.3d at 48; <u>Brisco</u> v. <u>Ercole</u>, 565 F.3d 80, 87 (2d Cir.), <u>cert. denied</u>, 558 U.S. 1063, 130 S. Ct. 739 (2009); <u>Jones</u> v. <u>West</u>, 555 F.3d 90, 96 (2d Cir. 2009); <u>Davis</u> v. <u>Grant</u>, 532 F.3d at 140; <u>Lynn</u> v. <u>Bliden</u>, 443 F.3d 238, 246 (2d Cir. 2006), <u>cert. denied</u>, 549 U.S. 1257, 127 S. Ct. 1383 (2007); <u>Howard</u> v. <u>Walker</u>, 406 F.3d at 122; <u>Parsad</u> v. <u>Greiner</u>, 337 F.3d at 181.

[12/]   <u>See also</u>, <u>e.g.</u>, <u>Woods</u> v. <u>Donald</u>, 135 S. Ct. at 1376; <u>Cullen</u> v. <u>Pinholster</u>, 131 S. Ct. at 1411; <u>Renico</u> v. <u>Lett</u>, 559 U.S. 766, 773, 130 S. Ct. 1855, 1862 (2010); <u>Waddington</u> v. <u>Sarausad</u>, 555 U.S. at 190, 129 S. Ct. at 831; <u>Yarborough</u> v. <u>Alvarado</u>, 541 U.S. at 664, 124 S. Ct. at 2150; <u>Wiggins</u> v. <u>Smith</u>, 539 U.S. at 520, 123 S. Ct. at 2535; <u>Price</u> v. <u>Vincent</u>, 538 U.S. at 641, 123 S. Ct. at 1853 ("As we have explained: '[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied [a Supreme Court case] incorrectly.'" (quoting <u>Woodford</u> v. <u>Visciotti</u>, 537 U.S. 19, 24-25, 123 S. Ct. 357, 360 (2002))); <u>Lockyer</u> v. <u>Andrade</u>, 538 U.S. at 75, 123 S. Ct. at 1175; <u>Watson</u> v. <u>Greene</u>, 640 F.3d 501, 508 (2d Cir.), <u>cert. denied</u>, 132 S. Ct. 335 (2011); <u>Dunlap</u> v. <u>Burge</u>, 583 F.3d at 165-66 (A "federal court might agree with a petitioner that the relevant federal law should have been interpreted differently than the way it was interpreted by the state court yet still conclude that the state court's application of the federal law was not unreasonable."); <u>Brisco</u> v. <u>Ercole</u>, 565 F.3d at 87-88; <u>Jones</u> v. <u>West</u>, 555 F.3d at 96; <u>Davis</u> v. <u>Grant</u>, 532 F.3d at 140; <u>Hawkins</u> v. <u>Costello</u>, 460 F.3d at 243; <u>Lynn</u> v. <u>Bliden</u>, 443 F.3d at 246; <u>Henry</u> v. <u>Poole</u>, 409 F.3d at 68; <u>Howard</u> v. <u>Walker</u>, 406 F.3d at 122; <u>Rosa</u> v. <u>McCray</u>, 396 F.3d at 219; <u>Cox</u> v. <u>Donnelly</u>, 387 F.3d at 197; <u>Eze</u> v. <u>Senkowski</u>, 321 F.3d at 124-25; <u>DelValle</u> v. <u>Armstrong</u>, 306 F.3d at 1200 ("With regard to issues of law, therefore, if the state court's decision was not an unreasonable application of, or contrary to, clearly

(continued...)

application of clearly established federal law was objectively unreasonable." Williams v. Taylor, 529 U.S. at 409, 120 S. Ct. at 1521.[13] "Objectively unreasonable" is different from "clear error." Lockyer v. Andrade, 538 U.S. at 75, 123 S. Ct. at 1175 ("The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."). This is a "'substantially higher threshold'" than incorrectness. Renico v. Lett, 559 U.S. at 773, 130 S. Ct. at 1862; accord, e.g., Davis v. Ayala, 135 S. Ct. 2187, 2198 (2015) ("Because the highly deferential AEDPA standard applies, we may not overturn the [state court's] decision unless that court applied [clearly established federal law] 'in an "objectively unreasonable" manner.'"); White v. Woodall, 134 S. Ct. at 1702 ("And an unreasonable application of [Supreme Court] holdings must be objectively unreasonable, not merely wrong; even clear error will not suffice." (quotations omitted)); Knowles v. Mirzayance, 556 U.S. at 123, 129 S. Ct. at 1420.[14] Federal habeas relief is precluded "so long

---

[12] (...continued)
established federal law as defined by Section 2254(d), we may not grant habeas relief even if in our judgment its application was erroneous.").

[13] Accord, e.g., McDaniel v. Brown, 558 U.S. 120, 132-33, 130 S. Ct. 665, 673 (2010); Yarborough v. Alvarado, 541 U.S. at 664, 124 S. Ct. at 2150; Wiggins v. Smith, 539 U.S. at 520-21, 123 S. Ct. at 2535; Price v. Vincent, 538 U.S. at 641, 123 S. Ct. at 1853; Lockyer v. Andrade, 538 U.S. at 75, 123 S. Ct. at 1174-75; Woodford v. Visciotti, 537 U.S. at 25-27, 123 S. Ct. at 360-61; Assadourian v. Brown, 493 F. App'x at 224; Watson v. Greene, 640 F.3d at 508; Portalatin v. Graham, 624 F.3d at 79; Dunlap v. Burge, 583 F.3d at 165; Davis v. Grant, 532 F.3d at 140; Mosby v. Senkowski, 470 F.3d 515, 519 (2d Cir. 2006), cert. denied, 552 U.S. 836, 128 S. Ct. 75 (2007); Hawkins v. Costello, 460 F.3d at 243; Lynn v. Bliden, 443 F.3d at 246; Henry v. Poole, 409 F.3d at 68; Howard v. Walker, 406 F.3d at 122; Cox v. Donnelly, 387 F.3d at 197; Eze v. Senkowski, 321 F.3d at 125; Ryan v. Miller, 303 F.3d 231, 245 (2d Cir. 2002); Loliscio v. Goord, 263 F.3d at 184; Lurie v. Wittner, 228 F.3d at 128-29.

[14] However, the Second Circuit has explained "that while '[s]ome increment of incorrectness beyond error is required . . . the increment need not be great; otherwise, habeas relief would
(continued...)

as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington

v. Richter, 562 U.S. 86, 101, 131 S. Ct. 770, 786 (2011); accord, e.g., Davis v. Ayala, 135 S. Ct. at

2199; Woods v. Donald, 135 S. Ct. at 1376; White v. Woodall, 134 S. Ct. at 1702 (A "'state prisoner

must show that the state court's ruling on the claim being presented in federal court was so lacking

in justification that there was an error well understood and comprehended in existing law beyond

any possibility for fairminded disagreement.'"); Nevada v. Jackson, 133 S. Ct. 1990, 1992 (2013);

Metrish v. Lancaster, 133 S. Ct. 1781, 1786-87 (2013).  "This is a 'difficult to meet' and 'highly

deferential standard for evaluating state-court rulings.'"  Cullen v. Pinholster, 131 S. Ct. at 1398

(citations omitted).[15]

---

[14]    (...continued)
be limited to state court decisions so far off the mark as to suggest judicial incompetence.'"
Jones v. Stinson, 229 F.3d at 119 (quoting Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir.
2000)); accord, e.g., Cornell v. Kirkpatrick, 665 F.3d 369, 375 (2d Cir. 2011); Brisco v.
Ercole, 565 F.3d at 88; Jones v. West, 555 F.3d at 96; Brown v. Alexander, 543 F.3d 94, 100
(2d Cir. 2008) ("[W]e have observed that the 'unreasonable application' standard 'falls
somewhere between merely erroneous and unreasonable to all reasonable jurists.'"); Davis
v. Grant, 532 F.3d at 140; Lynn v. Bliden, 443 F.3d at 246; Henry v. Poole, 409 F.3d at 68;
Howard v. Walker, 406 F.3d at 122; Rosa v. McCray, 396 F.3d at 219; Cox v. Donnelly, 387
F.3d at 197, 200-01; Yung v. Walker, 341 F.3d at 110; Eze v. Senkowski, 321 F.3d at 125;
Ryan v. Miller, 303 F.3d at 245; Loliscio v. Goord, 263 F.3d at 184.

[15]    Accord, e.g., Davis v. Ayala, 135 S. Ct. at 2198;  Woods v. Donald, 135 S. Ct. at 1376;
White v. Woodall, 134 S. Ct. at 1702 (AEDPA standard is "difficult to meet" (quotations
omitted)); Burt v. Titlow, 134 S. Ct. 10, 16 (2013) ("AEDPA erects a formidable barrier to
federal habeas relief for prisoners whose claims have been adjudicated in state court.");
Metrish v. Lancaster, 133 S. Ct. at 1787; Greene v. Fisher, 132 S. Ct. at 43; Contreras v.
Artus, 778 F.3d 97, 106 (2d Cir. 2014); Jackson v. Conway, 763 F.3d at 135; Jean v. Greene,
532 F. App'x 744, 749 (2d Cir. 2013); Santone v. Fischer, 689 F.3d 138, 147 (2d Cir.), cert.
denied, 133 S. Ct. 390 (2012).

"[T]he range of reasonable judgment can depend in part on the nature of the relevant rule." Yarborough v. Alvarado, 541 U.S. at 664, 124 S. Ct. at 2149.[16/] "Even if the state court issued a decision 'contrary to' clearly established Supreme Court law, a petitioner 'cannot obtain relief . . . unless application of a correct interpretation of that [Supreme Court] decision leads to the conclusion that his rights were violated.'" Cousin v. Bennett, 511 F.3d 334, 339 (2d Cir.), cert. denied, 553 U.S. 1096, 128 S. Ct. 2910 (2008) (citation omitted).

Under the AEDPA, in short, the federal courts "must give the state court's adjudication a high degree of deference." Yung v. Walker, 341 F.3d at 109; accord, e.g., Hardy v. Cross, 132 S. Ct. 490, 491 (2011); Cullen v. Pinholster, 131 S. Ct. at 1398; Felkner v. Jackson, 562

---

[16/]    The Supreme Court explained:

> [T]he range of reasonable judgment can depend in part on the nature of the relevant rule.  If a legal rule is specific, the range may be narrow.  Applications of the rule may be plainly correct or incorrect.  Other rules are more general, and their meaning must emerge in application over the course of time.  Applying a general standard to a specific case can demand a substantial element of judgment.  As a result, evaluating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.

Yarborough v. Alvarado, 541 U.S. at 664, 124 S. Ct. at 2149; accord, e.g.,White v. Woodall, 134 S. Ct. at 1705-06 (rejecting circuit cases that created an "unreasonable-refusal-to-extend rule"); Nevada v. Jackson, 133 S. Ct. at 1994; Parker v. Matthews, 132 S. Ct. at 2155 ("Particularly because the Darden standard is a very general one, leaving courts 'more leeway . . . in reaching outcomes in case-by-case determinations,' the Sixth Circuit had no warrant to set aside the Kentucky Supreme Court's conclusion." (citation omitted)); Harrington v. Richter, 562 U.S. at 101, 131 S. Ct. at 786; Renico v. Lett, 559 U.S. at 776, 130 S. Ct. at 1864; Knowles v. Mirzayance, 556 U.S. at 123, 129 S. Ct. at 1420 (Where the Supreme Court "standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard."); Contreras v. Artus, 778 F.3d at 110; Jackson v. Conway, 763 F.3d at 135; Watson v. Greene, 640 F.3d at 508-09; Portalatin v. Graham, 624 F.3d at 79; Ortiz v. N.Y.S. Parole in Bronx, N.Y., 586 F.3d at 157; Dunlap v. Burge, 583 F.3d at 166; Hawkins v. Costello, 460 F.3d at 243.

U.S. 594, 598, 131 S. Ct. 1305, 1307 (2011) (per curiam) ("On federal habeas review, AEDPA 'imposes a highly deferential standard for evaluating state-court rulings' and 'demands that state-court decisions be given the benefit of the doubt.'" (citation omitted)).[17/]  "[I]t is the petitioner's burden to demonstrate that the state court applied the relevant clearly established law to th[e] record in an objectively unreasonable manner."  Acosta v. Artuz, 575 F.3d 177, 184 (2d Cir. 2009) (citations omitted); accord, e.g., Cullen v. Pinholster, 131 S. Ct. at 1398 ("The petitioner carries the burden of proof."); Georgison v. Donelli, 588 F.3d at 154.  As the Supreme Court explained:

> If this standard is difficult to meet, that is because it was meant to be. . . . [§ 2254(d)] preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents.  It goes no farther. . . . As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

Harrington v. Richter, 562 U.S. at 102, 131 S. Ct. at 786-87; accord, Burt v. Titlow, 134 S. Ct. at 16.

Even where the state court decision does not specifically refer to either the federal claim or to relevant federal case law, the deferential AEDPA review standard applies.

> [D]etermining whether a state court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning.  And as this Court has observed, a state court need not cite or even be aware of [Supreme Court] cases under § 2254(d).  Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's

---

[17/]    See also, e.g., Woods v. Donald, 135 S. Ct. at 1376; Renico v. Lett, 559 U.S. at 773, 130 S. Ct. at 1862; Bell v. Cone, 543 U.S. at 455, 125 S. Ct. at 853; Evans v. Fischer, 712 F.3d at 132 ("We focus on the state appellate court's decision and, for issues adjudicated on the merits in state court, we apply a 'highly deferential standard for evaluating state-court rulings.'"); Mosby v. Senkowski, 470 F.3d at 519.

burden still must be met by showing there was no reasonable basis for the state court to deny relief.

Harrington v. Richter, 562 U.S. at 98, 131 S. Ct. at 784 (citations to Sellan v. Kuhlman, 261 F.3d at 312, & other cases omitted); accord, e.g., Johnson v. Williams, 133 S. Ct. 1088, 1094 (2013); Cullen v. Pinholster, 131 S. Ct. at 1402; Bell v. Cone, 543 U.S. at 455, 125 S. Ct. at 853; Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 365 (2002) (state court not required to cite Supreme Court cases, or even be aware of them, to be entitled to AEDPA deference, "so long as neither the reasoning nor the result of the state-court decision contradicts them"); Grayton v. Ercole, 691 F.3d 165, 174 (2d Cir. 2012) ("Where, as here, 'a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief.'"), cert. denied, 134 S. Ct. 79 (2013); Wilson v. Mazzuca, 570 F.3d 490, 499 (2d Cir. 2009) ("Where, as here, 'a state court fails to articulate the rationale underlying its rejection of a petitioner's claim, and when that rejection is on the merits, the federal court will focus its review on whether the state court's ultimate decision was an unreasonable application of clearly established Supreme Court precedent.'").[18] "'[A] habeas court must determine what arguments or theories . . . could have supporte[d] the state court's decision; and then it must

---

[18]    See also, e.g., Grayton v. Ercole, 691 F.3d at 169-70 & n.3; Wade v. Herbert, 391 F.3d 135, 140, 142 (2d Cir. 2004) (Appellate Division held claim was "'without merit.'"   "Such a summary determination, even absent citation of federal case law, is a determination 'on the merits' and as such requires the deference specified by § 2254."   Moreover, "[i]f any reasonable ground was available [for the state court's decision], we must assume the [state] court relied on it."); Francolino v. Kuhlman, 365 F.3d 137, 141 (2d Cir.) (where "the Appellate Division concluded its opinion by stating that it had 'considered and rejected defendants' remaining claims,'" AEDPA deference applies), cert. denied, 543 U.S. 872, 125 S. Ct. 110 (2004); Jenkins v. Artuz, 294 F.3d 284, 291 (2d Cir. 2002) ("In Sellan, we found that an even more concise Appellate Division disposition-the word 'denied'-triggered AEDPA deference.").

ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court.'" <u>Cullen</u> v. <u>Pinholster</u>, 131 S. Ct. at 1402.

"When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." <u>Harrington</u> v. <u>Richter</u>, 562 U.S. at 99, 131 S. Ct. at 784-85.

"[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." <u>Cullen</u> v. <u>Pinholster</u>, 131 S. Ct. at 1398; <u>accord</u>, <u>e.g.</u>, <u>Ryan</u> v. <u>Gonzales</u>, 133 S. Ct. 696, 708 (2013); <u>Greene</u> v. <u>Fisher</u>, 132 S. Ct. at 44; <u>Jackson</u> v. <u>Conway</u>, 763 F.3d at 135.

Finally, in appropriate circumstances, "[i]f [the] court finds that the state court engaged in an unreasonable application of established law, resulting in constitutional error, it must next consider whether such error was harmless." <u>Howard</u> v. <u>Walker</u>, 406 F.3d at 122.

In addition to the standard of review of legal issues, the AEDPA provides a deferential review standard for state court factual determinations: "a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1); <u>accord</u>, <u>e.g.</u>, <u>Burt</u> v. <u>Titlow</u>, 134 S. Ct. at 15; <u>Lewis</u> v. <u>Connecticut Comm'r of Corrs.</u>, No.14-193, --- F.3d ----, 2015 WL 2242383 at *8 (2d Cir. May 14, 2015); <u>Williams</u> v. <u>Ercole</u>, 486 F. App'x 208, 211 (2d Cir.), <u>cert. denied</u>, 133 S. Ct. 635 (2012); <u>Bierenbaum</u> v. <u>Graham</u>, 607 F.3d at 48; <u>Lynn</u> v. <u>Bliden</u>, 443 F.3d at 246-47; <u>Rosa</u> v. <u>McCray</u>, 396 F.3d at 220. "The petitioner bears the burden of 'rebutting the presumption of correctness by clear and convincing evidence.'" <u>Parsad</u> v. <u>Greiner</u>, 337 F.3d at 181

(quoting § 2254(e)(1)); accord, e.g., Burt v. Titlow, 134 S. Ct. at 15; Lewis v. Connecticut Comm'r of Corrs., 2015 WL 2242383 at *9; Williams v. Ercole, 486 F. App'x at 211; Bierenbaum v. Graham, 607 F.3d at 48 ("A state court's determination of a factual issue is presumed to be correct, and may only be rebutted by clear and convincing evidence."); Brown v. Alexander, 543 F.3d at 100; Lynn v. Bliden, 443 F.3d at 246-47.

## II.     GILFORD'S INSUFFICIENCY OF THE EVIDENCE CLAIM SHOULD BE DENIED

Gilford claims that his first degree assault conviction was supported by insufficient evidence. (Dkt. No. 3: Gilford Mot. to Amend at 5.)  Because the First Department's modification of Gilford's conviction to first degree attempted assault (see pages 14-15 above) would moot such a claim, the Court construes his pro se petition liberally, and assumes Gilford is arguing that his conviction for first degree attempted assault was supported by insufficient evidence.  The State argues that this claim is barred by an independent and adequate state procedural bar, since the New York Court of Appeals denied this claim as unpreserved, presumably based on the State's contemporaneous objection rule.   (Dkt. No. 8: State Br. at 6-12, citing N.Y. C.P.L. § 470.05.) However, Gilford's counsel did  (at the time of sentencing) move to dismiss the assault count on the grounds that Williams' stomach wound was not "serious." (See page 13 above.)  Because Gilford was not charged with attempted assault at the time of trial, there was no chance for his counsel also to argue that there was no evidence of Gilford's intent to cause serious injury.  Only after the First Department reduced the assault charge to attempted assault (see pages 14-15 above) did the issue of Gilford's intent arise, and his appellate counsel argued to the New York Court of Appeals that as a matter of law, "there was no evidence that . . . Gilford intended to cause serious physical injury" to Williams.  (Ex. 6: Gilford N.Y. Ct. App. Br. at 52-55, emphasis added.)  This Court, however,

need not decide if Gilford's claim is procedurally barred because in any event it is without merit. (See State Br. at 13-15.)

Viewing the evidence in the light most favorable to the prosecution, a reasonable trier of fact could have inferred that Gilford intended to seriously injure Williams.  Williams testified that in the midst of a violent melee, Gilford approached him, threatened to "poke" him, lunged at him with a knife, stabbed him in the abdomen, and ran for the exit.  (See page 8 above.) The ER doctor described how a stab wound to the stomach could lead to sepsis, shock and death.  (See page 11 above.)  As the First Department held, these facts are sufficient to support an inference of intent to cause serious physical injury.  People v. Gilford, 65 A.D.3d 840, 841, 884 N.Y.S.2d 731, 733 (1st Dep't 2009).  Williams' testimony alone is sufficient to support Gilford's conviction.  United States v. Danzey, 594 F.2d 905, 916 (2d Cir.) ("[T]he testimony of a single, uncorroborated eyewitness is generally sufficient to support a conviction."), cert. denied, 441 U.S. 951, 99 S. Ct. 2179 (1979). Further, New York courts repeatedly have upheld inferences of intent to cause serious injury in cases with similar facts.  See, e.g., People v. Brown, 100 A.D.3d 1035, 1036, 952 N.Y.S.2d 828, 830 (3d Dep't 2012) (defendant's swinging at victim with a keychain containing an open utility knife sufficient to establish intent to cause serious physical injury); People v. Stoby, 4 A.D.3d 766, 766, 771 N.Y.S.2d 623, 625 (4th Dep't 2004) ("In order to be found guilty of attempting to commit a crime, a defendant must have engaged in conduct that came dangerously near commission of the completed crime . . . .  [W]e conclude that the evidence that defendant swung a knife and stabbed the victim in the back is legally sufficient to establish that he intended to cause serious physical injury." (citations & quotations omitted)); People v. Willock, 298 A.D.2d 161, 162, 748 N.Y.S.2d 17, 18 (1st Dep't  2002) ("[C]redible evidence that defendant approached the victim with a 10-inch

knife and thrust it toward his heart clearly established that defendant intended to cause serious physical injury."); People v. Kenward, 266 A.D.2d 155, 155, 699 N.Y.S.2d 35, 35 (1st Dep't 1999) ("Based on testimony that defendant had expressed a threatening intention and thrust the knife at the complainant, who blocked the weapon with his hand, the jury reasonably could have inferred an intent to inflict serious physical injury."); People v. Santos, 213 A.D.2d 302, 302, 624 N.Y.S.2d 154, 154-55 (1st Dep't 1995) (Defendant's conduct "was sufficient proof that defendant intended to cause the police officer serious physical injury. . . .  Defendant's intent is inferred from his conduct of throwing the knife and attacking the police officer after the officer attempted to subdue defendant." (citations omitted)), aff'd, 86 N.Y.2d 869, 635 N.Y.S.2d 168 (1995).

## III.   THE SHOWUP WAS NOT IMPERMISSIBLY SUGGESTIVE, AND IN ANY EVENT, COOPER'S IDENTIFICATION WAS INDEPENDENTLY RELIABLE

Gilford asserts that Justice Cirigliano should have suppressed Lakeshia Cooper's identification testimony because it was the product of an unduly suggestive showup procedure. (Dkt. No. 1: Pet. Br. at 7-12.)  After a pre-trial suppression hearing, Justice Cirigliano found no basis to suppress the showup or in court identifications because:

> [T]he show-up took place within a short period of time after the commission of the crime and in close proximity to the scene of the crime.  Further, when Police Officer Majersky was told to drive defendant Gilford "immediately" to the hospital for an identification by the victim, exigent circumstances were in place because the victim was in critical condition.  The acts of the police officer in arranging a show-up identification at Lincoln Hospital with witnesses that were present at the crime scene, amounts to an act of preservation of the witnesses' "fresh memories" of the event . . . .

(Ex. 1: 8/1/06 Order at 7; see page 5 above.)  The First Department also denied this claim on the merits, holding "the showup was within permissibly close temporal and geographic proximity to the crime, took place shortly after the witness had already made a reliable identification, and was

conducted in a manner that was not unduly suggestive." <u>People</u> v. <u>Gilford</u>, 65 A.D.3d 840, 842, 884

N.Y.S.2d 731, 733 (1st Dep't 2009) (citations omitted); <u>see</u> page 14 above.  The Court of Appeals

found that the determination of the trial court, "undisturbed by the Appellate Division, and supported

by evidence in the record" was beyond further review.  <u>People</u> v. <u>Gilford</u>, 16 N.Y.3d 864, 868, 924

N.Y.S.2d 314, 316 (2011); <u>see</u> page 15 above.  The trial court's finding on this issue, affirmed by

New York's highest court, is entitled to a presumption of correctness.  (<u>See</u> cases cited at pages 27-

28 above.)

A.     **Applicable Legal Standard**

A defendant's right to due process includes the right not to be the object of pretrial

identification procedures that are "so impermissibly suggestive as to give rise to a very substantial

likelihood of irreparable misidentification." <u>Simmons</u> v. <u>United States</u>, 390 U.S. 377, 384, 88 S. Ct.

967, 971 (1968); <u>accord</u>, <u>e.g.</u>, <u>Perry</u> v. <u>New Hampshire</u>, 132 S. Ct. 716, 720 (2012); <u>Manson</u> v.

<u>Brathwaite</u>, 432 U.S. 98, 106 n.9, 114, 97 S. Ct. 2243, 2249  n.9, 2253 (1977); <u>Neil</u> v. <u>Biggers</u>, 409

U.S. 188, 198-200, 93 S. Ct. 375, 381-82 (1972).[19]

---

[19]     <u>See also</u>, <u>e.g.</u>, <u>United States</u> v. <u>Ward</u>, 505 F. App'x 18, 23 (2d Cir. 2012); <u>McKinnon</u> v.
<u>Superintendent, Great Meadow Corr. Facility</u>, 422 F. App'x. 69, 74 (2d Cir. 2011), <u>cert.</u>
<u>denied</u>, 132 S. Ct. 1151 (2012); <u>Dunlap</u> v. <u>Burge</u>, 583 F.3d 160, 165 (2d Cir.), <u>cert. denied</u>,
558 U.S. 1037, 130 S. Ct. 642 (2009); <u>Brisco</u> v. <u>Ercole</u>, 565 F.3d 80, 88 (2d Cir.), <u>cert.</u>
<u>denied</u>, 558 U.S. 1063, 130 S. Ct. 739 (2009); <u>Kennaugh</u> v. <u>Miller</u>, 289 F.3d 36, 43-44 (2d
Cir.), <u>cert. denied</u>, 537 U.S. 909, 123 S. Ct. 251 (2002); <u>United States</u> v. <u>Facey</u>, No. 98-1196,
201 F.3d 433 (table), 1999 WL 1070012 at *2 (2d Cir. Nov. 10, 1999); <u>United States</u> v.
<u>Smith</u>, No. 97-1273, 152 F.3d 921 (table), 1998 WL 398813 at *1 (2d Cir. June 5, 1998);
<u>Yearwood</u> v. <u>Keane</u>, No. 95-2404, 101 F.3d 685 (table), 1996 WL 282134 at *1 (2d Cir.
May 29, 1996); <u>United States</u> v. <u>Thai</u>, 29 F.3d 785, 807 (2d Cir.), <u>cert. denied</u>, 513 U.S. 977,
115 S. Ct. 456 (1994); <u>United States</u> v. <u>Rosa</u>, 11 F.3d 315, 330 (2d Cir. 1993), <u>cert. denied</u>,
511 U.S. 1042, 114 S. Ct. 1565 (1994); <u>United States</u> v. <u>Concepcion</u>, 983 F.2d 369, 377 (2d
Cir. 1992), <u>cert. denied</u>, 510 U.S. 856, 114 S. Ct. 163 (1993); <u>Sales</u> v. <u>Harris</u>, 675 F.2d 532,
(continued...)

In determining whether a pre-trial identification procedure is unduly suggestive, the reviewing court must consider the totality of the circumstances.  See, e.g., Perry v. New Hampshire, 132 S. Ct. at 725; Manson v. Brathwaite, 432 U.S. at 113-14, 97 S. Ct. at 2252-53; Neil v. Biggers, 409 U.S. at 199-200, 93 S. Ct. at 382; Stovall v. Denno, 388 U.S. 293, 302, 87 S. Ct. 1967, 1972 (1967).[20]

In order to evaluate the constitutional permissibility of in-court identification testimony based on out-of-court pretrial identification procedures, the Supreme Court has adopted a two-step inquiry:

---

[19]   (...continued)
537-38 (2d Cir.), cert. denied, 459 U.S. 876, 103 S. Ct. 170 (1982); Brown v. Fisher, 13 Civ. 2071, 2015 WL 3619628 at *12-13 (S.D.N.Y. June 9, 2015); Stanley v. Smith, 12 Civ. 6362, 2014 WL 5039444 at *17 (S.D.N.Y. Sept. 26, 2014); Espiritu v. Haponik, 05 Civ. 7057, 2012 WL 161809 at *5 (S.D.N.Y. Jan. 19, 2012); United States v. Morgan, 690 F. Supp. 2d 274, 282 (S.D.N.Y. 2010); Fuller v. Schultz, 572 F. Supp. 2d 425, 442-43 (S.D.N.Y. 2008); Elliott v. Kuhlman, 97 Civ. 2987, 2004 WL 1375160 at *7 (S.D.N.Y. June 17, 2004); United States v. Joseph, 332 F. Supp. 2d 571, 581 (S.D.N.Y. 2004); Mendoza v. McGinnis, 03 Civ. 2598, 2004 WL 736894 at *5-6 (S.D.N.Y. Apr. 5, 2004); Arkin v. Bennett, 282 F. Supp. 2d 24, 32 (S.D.N.Y. 2003); Mitchell v. Walsh, 00 Civ. 5696, 2003 WL 22019736 at *12 (S.D.N.Y. Aug. 22, 2003); Garry v. Greiner, 01 Civ. 0848, 2003 WL 21436217 at *3 (S.D.N.Y. June 19, 2003); Valtin v. Hollins, 248 F. Supp. 2d 311, 317-18 (S.D.N.Y. 2003).

[20]   See also, e.g., Conner v. Poole, 440 F. App'x 29, 31 (2d Cir. 2011), cert. denied, 132 S. Ct. 1015 (2012); Brisco v. Ercole, 565 F.3d at 88, 89; Wiggins v. Greiner, 132 F. App'x 861, 864-65 (2d Cir.), cert. denied, 546 U.S. 986, 126 S. Ct. 569 (2005); Raheem v. Kelly, 257 F.3d 122, 135 (2d Cir. 2001), cert. denied, 534 U.S. 1118, 122 S. Ct. 930 (2002); United States v. Shodeinde, No. 96-1512, 108 F.3d 1370 (table), 1997 WL 138701 at *2 (2d Cir. Mar. 21, 1997); United States v. Concepcion, 983 F.2d at 377; United States v. Reid, 527 F.2d 380, 384 (2d Cir. 1975); United States v. Montayne, 486 F.2d 263, 267 (2d Cir. 1973), cert. denied, 416 U.S. 962, 94 S. Ct. 1982 (1974); Brown v. Fisher, 2015 WL 3619628 at *12-13;  Aviles v. Capra, No. 13-CV-1153, 2014 WL 6085889 at *1 (E.D.N.Y. Nov. 13, 2014); Stanley v. Smith, 2014 WL 5039444 at *17; United States v. Williams, 999 F. Supp. 412, 414 (W.D.N.Y. 1998), aff'd, 192 F.3d 280 (2d Cir. 1999); Hodge v. Henderson, 761 F. Supp. 993, 1007 (S.D.N.Y. 1990), aff'd, 929 F.2d 61 (2d Cir. 1991).

> The Supreme Court has established a two-step inquiry for evaluating the constitutional permissibility of in-court identification testimony based on out-of-court identification procedures.
>
> [Step 1:] That inquiry "requires a determination of whether the identification process was impermissibly suggestive and, if so, whether it was so suggestive as to raise 'a very substantial likelihood of irreparable misidentification.'"
>
> [Step 2:] If pretrial procedures have been unduly suggestive, a court may nonetheless admit in-court identification testimony if the court determines it to be independently reliable. The court should consider the reliability of the identification in light of "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of [the witness'] prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation.  Against these factors is to be weighed the corrupting effect of the suggestive identification itself." For both pretrial and in-court identifications, the linchpin of admissibility is reliability.  However, if impermissibly suggestive procedures are not employed, "independent reliability is not a constitutionally required condition of admissibility, and the reliability of the identification is simply a question for the jury."

United States v. Wong, 40 F.3d 1347, 1359 (2d Cir. 1994) (citations omitted), cert. denied, 514 U.S. 1113, 115 S. Ct. 1968 (1995).[21]

"While showup identifications are generally suspect and disfavored, at-the-crime-scene civilian showup identifications are not presumptively infirm." People v. Duuvon, 77 N.Y.2d 541, 543, 569 N.Y.S.2d 346, 347 (1991).  The fruits of a showup identification will be excluded only if the identification "was both produced through an unnecessarily suggestive procedure and [was] unreliable." United States v. Bautista, 23 F.3d 726, 729 (2d Cir. 1994); accord, e.g., Brisco v. Ercole, 565 F.3d at 88-95.  Whether an identification procedure was unnecessarily

---

[21]    See, e.g.,  Perry v. New Hampshire, 132 S. Ct. at 724-25; United States v. Harris, 598 F. App'x 44 (2d Cir. 2015); Brisco v. Ercole, 565 F.3d at 88; United States v. Argentina, 173 F. App'x 90, 93 (2d Cir. 2006); Yearwood v. Keane, 1996 WL 282134 at *1; United States v. Thai, 29 F.3d at 807-08; United States v. Butler, 970 F.2d 1017, 1021 (2d Cir.), cert. denied, 506 U.S. 980, 113 S. Ct. 480 (1992).

suggestive depends on (1) the suggestiveness of the procedure and (2) the necessity of the procedure. United States v. Bautista, 23 F.3d at 730 (citing United States v. Stevens, 935 F.2d 1380, 1389 (3d Cir. 1991)); see, e.g., Perry v. New Hampshire, 132 S. Ct. at 723-26; Conner v. Poole, 440 F. App'x at 31-32.[22/]  The focus of the inquiry is on the possibility of misidentification, not the conduct of the police, because a suggestive procedure "'does not in itself intrude upon a constitutionally protected interest.'" Wray v. Johnson, 202 F.3d 515, 524 (2d Cir. 2000) (quoting Manson v. Brathwaite, 432 U.S. at 113 n.13, 97 S. Ct. at 2254 n.13).

**B.     Application to Gilford's Claim**

**1.     The Showup Identification Was Not Unduly Suggestive Or Unnecessary**

In this case, the showup identification was neither unduly suggestive nor unnecessary.  Gilford first argues that successive procedures tainted Cooper's identification. (Dkt. No. 1: Pet. Br. at 9.) This argument is unavailing because courts have found that successive identification procedures "are not per se unduly suggestive, even where the accused is the only common denominator among them." McKinnon v. Superintendent, Great Meadow Corr. Facility, 422 F. App'x 69, 74 (2d Cir. 2011); see also, e.g., Young v. Conway, 715 F.3d 79, 88 n.2 (2d Cir.) (citing cases), cert. denied, 134 S. Ct. 20 (2013);  People v. Duuvon, 77 N.Y.2d 541, 545, 569 N.Y.S.2d 346, 348 (1991).  Further, the only police-arranged identification procedure in this case was the showup at Lincoln Hospital.  At both the suppression hearing and trial, Sergeant Walton

---

[22/]     See also, e.g., Hicks v. Bellnier, 43 F. Supp. 3d 214, 231 (E.D.N.Y. 2014); Candelario v. City of N.Y., 12 Civ. 1206, 2013 WL 1339102 at *4 (S.D.N.Y. Apr. 3, 2013), aff'd, 539 F. App'x 17 (2d Cir. 2013); Purdie v. Graham, 09 Civ. 8116, 2010 WL 3912732 at *9 (S.D.N.Y. Sept. 16, 2010); Jameson v. Grier, 01 Civ. 6678, 2002 WL 100642 at *19-20 (S.D.N.Y. Jan. 25, 2002) (Peck, M.J.).

testified that Cooper's original, on the scene identification of Gilford was spontaneous.  (See pages 4-5, 9 above.)   See People v. Duuvon, 77 N.Y.2d at 546, 569 N.Y.S.2d at 349 ("[T]he first identification, made spontaneously by the pursuing manager, does not even qualify for categorization as a police-arranged street showup. The only police-arranged showup at issue in this case is the one by the employee and we have not previously condemned, based on a presumption or as a matter of law, a single at-the-scene showup identification.").

Gilford next asserts that the prosecution offers no reason why a line-up identification would have been "unduly burdensome." (Pet. Br. at 11-12.)  In the Second Circuit, it has long been "settled law that prompt, on-the-scene confrontation is 'consistent with good police work', and does not offend the principles established in United States v. Wade." Cummings v. Zelker, 455 F.2d 714, 716 (2d Cir.) (citations omitted), cert. denied, 406 U.S. 927, 92 S. Ct. 1800 (1972).   Justice Cirigliano admitted the showup identification in part because it was "an act of preservation of the witnesses' 'fresh memories of the event. . . . '" (Ex. 1: 8/1/06 Order at 7; see page 5 above.)  If Deweese or Cooper stated after the showup that Gilford was not the person who stabbed James, Officers Majersky and Hurley would have gathered the important information that the search for a suspect should continue.  Though Gilford may be correct that a line-up would not have been unduly burdensome, the showup was an effective means of confirming that there was no need to "'resume the search for the fleeing culprit while the trail [wa]s fresh.'" Cummings v. Zelker, 455 F.2d at 716.[23/]

---

[23/]    See also, e.g., Charlemagne v. Goord, 05 Civ. 9890, 2008 WL 2971768 at *14 (S.D.N.Y. June 30, 2008), report & rec. adopted, 2011 WL 2150646 (S.D.N.Y. May 31, 2011); Williams v. Ercole, 06 Civ. 0044, 2007 WL 1052446 at *4 (S.D.N.Y. Apr. 6, 2007); Valtin
(continued...)

Gilford similarly argues that the circumstances were not sufficiently exigent to justify a showup procedure.   (Pet. Br. at 10-12.)   This argument fails as numerous courts have acknowledged the utility of a showup conducted in close temporal and spatial proximity to the crime.   See, e.g., Brisco v. Ercole, 565 F.3d 80, 89 (2d Cir.) ("[W]e have held that identification evidence from showups held in close temporal and geographic proximity to the crime scene may be admitted."), cert. denied, 558 U.S. 1063, 130 S. Ct. 739 (2009); Hicks v. Bellnier, 43 F. Supp. 3d 214, 232-33 (E.D.N.Y. 2014) (admission of showup identification that occurred within four or five blocks of the crime and five or ten minutes after 911 call was "wholly appropriate"); John v. Griffen, 13 Civ. 922, 2014 WL 866277 at *12 (S.D.N.Y. Mar. 4, 2014); De Michele v. City of N.Y., 09 Civ. 9334, 2012 WL 4354763 at *10 (S.D.N.Y. Sept. 24, 2012) ("Appropriate factors to consider in determining if a particular showup is unduly suggestive include proximity in time and location to the point of arrest, as well as the 'uncertain, emergent realities and varieties of these street situations.'"); Walker v. Poole, 547 F. Supp. 2d 238, 246 (W.D.N.Y. 2008) (showup did not violate defendant's due process rights, even if the Court "were to agree with [petitioner] that exigent circumstances were lacking," when it took place "in extremely close spatial and temporal proximity to the crime").[24]

---

[23]   (...continued)
  v. Hollins, 248 F. Supp. 2d 311, 318 (S.D.N.Y. 2003).

[24]   See also, e.g., Purdie v. Graham, 09 Civ. 8116, 2010 WL 3912732 at *10 (S.D.N.Y. Sept. 16, 2010) (admitting showup identification made by an eyewitness outside of her home and within fifteen to thirty minutes of the crime); Charlemagne v. Goord, 05 Civ. 9890, 2008 WL 2971768 at *15 ("[T]he fact that the show-up occurred within thirty minutes of the burglary and only eighteen blocks from the scene of the crime further suggests that the procedure was not unduly suggestive and was, instead, the product of effective police work."
(continued...)

The evidence at the suppression hearing demonstrated that the showup took place within an hour of the assault.  (Compare Majersky: S. 65 ("my partner and I received a radio run" at approximately 2:15 a.m.), with Majersky: S. 76 (the show-up identification took place at "approximately 2:45 in the morning").)  Lincoln Hospital is approximately ten blocks away from Skate Key.  (Walton: S. 16.)  While the circumstances of the showup were suggestive, as showups generally are, it cannot be said that Justice Cirigiliano's reliance on the spatial and temporal proximity of the showup to the scene of a rapidly unfolding crime was unreasonable.

Gilford might argue that the showup was unnecessary because Cooper spontaneously identified him at the scene of the crime, he was apprehended after a foot pursuit in which Walton "never lost sight of him," and Cooper again identified him at that time.  (See pages 4, 9 above.)  If the police here were absolutely certain that they had the right man, then there was no need for a showup to ensure "'the immediate release of an innocent suspect.'"  Cummings v. Zelker, 455 F.2d at 716.  If that is the case, however, and the showup was not necessary because the police knew Gilford to be guilty, then the admission at trial of Cooper's testimony regarding the showup (see pages 9-10 above) was, at most, harmless error, particularly in a bench trial.  E.g., Wray v. Johnson, 202 F.3d 515, 524-25 (2d Cir. 2000) (error in admitting identification testimony is subject to harmless error analysis on habeas review); Dunnigan v. Keane, 137 F.3d 117, 130 (2d Cir.) (admission of impermissibly suggestive identification held to be harmless error), cert. denied, 525 U.S. 840, 119 S. Ct. 101 (1998), abrogated on other grounds by Perry v. New Hampshire, 132 S. Ct.

---

24/  (...continued)
(record citation omitted)); Warren v. Conway, No. 07-CV-4117, 2008 WL 4960454 at *23 (E.D.N.Y. Nov. 18, 2008) (showup conducted within ninety minutes and one mile from the crime scene within permissible temporal and spatial proximity).

716 (2012); Jameson v. Grier, 01 Civ. 6678, 2002 WL 100642 at *21 (S.D.N.Y. Jan. 25, 2012) (Peck, M.J.).

Accordingly, Cooper's showup identification was either (1) required by exigent circumstances, and not "unnecessarily suggestive," or (2) harmless error, as Cooper's prior identifications of Gilford rendered the showup identification unnecessary and cumulative.

### 2. In Any Event, Cooper's In-Court Identification Was Independently Reliable

Gilford asserts that Cooper's in-court identification "was predicated on suggestive elements" and should have been suppressed.  (Dkt. No. 1: Pet. Br. at 10.)  Justice Cirigiliano, however, had ample reason to find Cooper's identification independently reliable, regardless of whether the showup was impermissibly suggestive.  As the Second Circuit has noted, "[i]f pretrial procedures have been unduly suggestive, a court may nonetheless admit in-court identification testimony if the court determines it to be independently reliable."  United States v. Wong, 40 F.3d 1347, 1359 (2d Cir.1994), cert. denied, 514 U.S. 1113, 115 S. Ct. 1968 (1995); see also cases cited on page 33 above.

> To ascertain whether an identification has reliability independent of the unduly suggestive identification procedures, courts generally look to five established factors, first set forth in Neil v. Biggers: [1] the opportunity of the witness to view the criminal at the time of the crime, [2] the witness' degree of attention, [3] the accuracy of the witness' prior description of the criminal, [4] the level of certainty demonstrated by the witness at the confrontation, and [5] the length of time between the crime and the confrontation.

Brisco v. Ercole, 565 F.3d 80, 89 (2d Cir.) (quotations & citations omitted), cert. denied, 558 U.S. 1063, 130 S. Ct. 739 (2009).

The trial record demonstrates that Cooper's in-court identification of Gilford was reliable.  Cooper had an initial opportunity to observe Gilford when he intervened in the first altercation between Gary and Askew.  (See page 7 above.)  During the fight at Skate Key, Cooper had further opportunity to view Gilford, as she stood next to James while he fought with Gilford. (See page 7 above.)  Cooper pulled James out of the fight and observed Gilford stab him.  (See page 7 above.)  Cooper testified that she clearly saw these events, and in fact was "inches" away as they unfolded.  (Cooper: Tr. 602; see page 7 above.)  After the fight, Cooper accurately identified Gilford in a crowd of people outside Skate Key.  (See page 9 above.)  She again identified him after the police stopped him.  (See page 4 above.)  Finally, the showup took place shortly after the crime, and Cooper identified Gilford without hesitation.  (Majersky: S. 75.)

Consequently, Cooper's identification was admissible because it was independently reliable.  See, e.g., Conner v. Poole, 440 F. App'x 29, 31-32 (2d Cir. 2011), cert. denied, 132 S. Ct. 1015 (2012); Velez v. Cunningham, 09 Civ. 6506, 2013 WL 5272953 at *20 (S.D.N.Y. Sept. 17, 2013); Stallings v. Heath, 11 Civ. 4894, 2012 WL 73599 at *12-13 (S.D.N.Y. Mar. 7, 2012) (Peck, M.J.) Burgess v. Conway, 09 Civ. 9151, 2010 WL 6841526 at *13-14 (S.D.N.Y. Oct. 21, 2010) (identification was independently reliable where witness did not appear "uncertain" of the identification), report & rec. adopted, 2011 WL 2638141 (S.D.N.Y. July 5, 2011); Mitchell v. Lempke, No. 10-CV-1696, 2010 WL 3937306 at *7 (E.D.N.Y. Oct. 4, 2010); Adelman v. Ercole, No. 08 CV 3609, 2010 WL 3210718 at *2 (E.D.N.Y. Aug. 12, 2010) (identification independently

reliable where witness "'got a good look'" at defendant's face as he ran down her stairs and fled her home, gave an accurate description to police, and did not hesitate when identifying defendant).[25]

In consideration of the factors outlined in Neil v. Biggers, Cooper's identification of Gilford was not "'so unnecessarily suggestive and conducive to irreparable mistaken identification'" that it was inappropriate for the factfinder to determine the weight to give the evidence. Neil v. Biggers, 409 U.S. 188, 196, 93 S. Ct. 375, 380 (1972) (quoting Stovall v. Denno, 388 U.S. 293, 301-02, 87 S. Ct. 1967, 1972 (1967)). The state court's determination cannot be said to be contrary or inconsistent with Supreme Court precedent. See, e.g., Brisco v. Ercole, 565 F.3d at 90

---

[25] See also, e.g., Washington v. Goord, 09 Civ. 10308, 2010 WL 2594310 at *6 (S.D.N.Y. June 22, 2010) (identification was independently reliable where witness had an opportunity to view defendant's face while defendant held a gun to witness' head, even though lineup was conducted one month after robbery and witness was subsequently unable to identify defendant in court); Curry v. Burge, 03 Civ. 0901, 2004 WL 2601681 at *21-22 (S.D.N.Y. Nov. 17, 2004) (Peck, M.J.) (finding independent basis for tainted identification where witness had seen petitioner "on at least three separate occasions before the line-up; first when [petitioner] shot him, once at his parole office, and at least once around the neighborhood"), report & rec. adopted, 2005 WL 106490 (S.D.N.Y. Jan. 19, 2005); Mendoza v. McGinnis, 03 Civ. 2598, 2004 WL 736894 at *7 (S.D.N.Y. Apr. 5, 2004) (Chin, D.J.) ("[E]ven assuming the identification procedure was unduly suggestive, a consideration of the factors outlined in Biggers supports the trial court's refusal to suppress the evidence because the procedure was sufficiently independently reliable. . . . [The witness] not only had the opportunity to view petitioner at the time of the crime, but he also spoke to him, face-to-face, while standing approximately three feet away, for several minutes. Similarly, when [the witness] identified petitioner at the scene of the arrest, he stood just a few feet away from petitioner, in well lit conditions, and viewed petitioner's face without any obstruction." (record citation omitted)); Pittman v. Portuondo, No. 97-CV-2426, 1999 WL 1251820 at *4 (E.D.N.Y. Dec. 17, 1999) ("[M]ilitating in favor of the independent reliability of [the witness'] in-court identification was its unequivocal nature and the fact that [the witness] had seen [petitioner] before (both at the barbecue and around her neighborhood previously)." (record citation omitted)).

(discussing AEDPA's "fairly permissive standard" regarding identification issues).  Accordingly, habeas relief should be denied on this claim.

## III.   GILFORD'S INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM IS BARRED BY ADEQUATE AND INDEPENDENT STATE LAW GROUNDS

Gilford's ineffective assistance of counsel claim was raised for the first time in his motion to vacate his conviction under C.P.L. § 440.10.  (See pages 15-16 above).  Justice Cirigliano denied Gilford's ineffective assistance of counsel claim because it could have been raised on direct appeal.  (See page 16 above.)  Under C.P.L. § 440.10(2)(c), a "court may deny a motion to vacate a judgment" when

> [a]lthough sufficient facts appear on the record of the proceedings underlying the judgment to have permitted, upon appeal from such judgment, adequate review of the ground or issue raised upon the motion, no such appellate review or determination occurred owing to the defendant's unjustifiable failure to take or perfect an appeal during the prescribed period or to his unjustifiable failure to raise such ground or issue upon an appeal actually perfected by him.

C.P.L. § 440.10(2)(c). Justice Cirigliano's express reliance on a state procedural rule constitutes an independent state law ground for his decision; C.P.L. § 440.10(2)(c) also is a "firmly established and regularly followed" state procedural ground barring federal habeas review.  See, e.g., Clark v. Perez, 510 F.3d 382, 393 (2d Cir.) ("the district court erred in holding that the state court's application of section 440.10(2)(c) did not constitute an adequate state procedural bar to [petitioner's] federal habeas petition"), cert denied, 555 U.S. 823, 129 S. Ct. 130 (2008); Sweet v. Bennett, 353 F.3d 135, 139 (2d Cir. 2003); Davis v. Mantello, 42 F. App'x 488, 490 (2d Cir. 2002) ("The unjustifiable failure to raise on direct appeal a claim that appears on the face of the record is a procedural default under New York law and therefore constitutes an independent and adequate state ground for the

state court's rejection of the petitioner's claim."), cert. denied, 538 U.S. 986, 123 S. Ct. 1803 (2003);

Reyes v. Keane, 118 F.3d 136, 139 (2d Cir. 1997); Dorsey v. Irvin, 56 F.3d 425, 426 (2d Cir. 1995);

Levine v. Comm'r of Corr. Servs., 44 F.3d 121, 126 (2d Cir. 1995) (§ 440.10(2)(c) is adequate and

independent state ground); La Touche v. Graham, 10 Civ. 1388, 2013 WL 5323499 at *12 (S.D.N.Y.

Sept. 23, 2013) ("Where a claim is sufficiently based in the record, a state court's reliance on §

440.10(2)(c) constitutes an adequate and independent state law ground that ordinarily precludes a

federal court from further habeas review.").[26]

## A.   Gilford Has Not Shown Cause And Prejudice Or A Fundamental Miscarriage Of Justice

Because there is an adequate and independent finding by Justice Cirigliano that

Gilford's ineffective assistance claim was procedurally defaulted, Gilford's habeas petition would

have to "show 'cause' for the default and 'prejudice attributable thereto,' or demonstrate that failure

to consider the federal claims will result in a 'fundamental miscarriage of justice.'"  Harris v. Reed,

489 U.S. 255, 262, 109 S. Ct. 1038, 1043 (1989) (citations omitted).  Gilford does not allege cause

---

[26]   See also, e.g., Johnson v. Sabourin, 03 Civ. 0791, 2005 WL 2663039 at *3-5 (S.D.N.Y. Oct. 13, 2005) (§ 440 court's denial of ineffective assistance claims based on facts in trial record pursuant to C.P.L. § 440.10(2)(b) was an adequate and independent state law ground barring federal habeas review); Gillespie v. Miller, 04 Civ. 0295, 2004 WL 1689735 at *12 (S.D.N.Y. July 29, 2004) (Peck, M.J.) (state court's denial of ineffective assistance claim under C.P.L. § 440.10(2) because it could have been raised on direct appeal is adequate and independent ground); Ramos v. Costello, 96 Civ. 3659, 1997 WL 231129 at *2 (S.D.N.Y. May 7, 1997) ("The procedural ground on which the state court denied his § 440.10 motion" – "namely, that they were barred by a New York rule precluding claims that could have been raised on direct appeal but were not" – "is an independent and adequate state ground that prevents him from asserting those claims in a federal habeas corpus proceeding absent cause and prejudice."); Wells v. LaFavre, 96 Civ. 3417, 1996 WL 692003 at *3 (S.D.N.Y. Dec. 2, 1996) ("C.P.L. § 440.10(2) presents an adequate and independent state ground for denying Petitioner relief.").

for his failure to raise his ineffective assistance claim on direct appeal, and does not assert prejudice resulting therefrom.  Nor does Gilford contend that he actually is innocent.  Rather, in the context of counsel's alleged ineffective assistance, he reargues the point raised in his withdrawn "weight of the evidence" claim, that the knife he admitted to possessing was not capable of causing the injuries to James and Williams attributed to him by the prosecution.  (See Dkt. No. 1: Pet. Br. at 1-6, 13-14.)

      The Supreme Court has explained that the fundamental miscarriage of justice exception is "tied . . . to [a] petitioner's innocence" and exists to protect those who are "actually innocent."  Schlup v. Delo, 513 U.S. 298, 321, 324, 115 S.Ct. 851, 864, 865 (1995).  Because "'actual innocence' means factual innocence, not mere legal insufficiency," Bousley v. United States, 523 U.S. 614, 623-24, 118 S.Ct. 1604, 1611 (1998); accord, e.g., Sweet v. Bennett 353 F.3d 135, 142 (2d Cir. 2003); Dunham v. Travis, 313 F.3d 724, 730 (2d Cir. 2002), "prisoners asserting innocence as a gateway to defaulted claims must establish that, in light of new evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'"  House v. Bell, 547 U.S. 518, 536-37, 126 S. Ct. 2064, 2076-77 (2006) (emphasis added); see also, e.g., Schlup v. Delo, 513 U.S. at 324-27, 115 S. Ct. at 865-67 (fundamental miscarriage of justice must  be demonstrated by showing through "new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial," that "it is more likely than not that no reasonable juror would have convicted him in light of the new evidence."); Johnson v. Bellnier, 508 F. App'x 23, 25 (2d Cir.) ("Establishing actual innocence is not easy.   To establish actual innocence, petitioner must demonstrate that, in light of all the evidence, it is more likely than not that no reasonable juror would

have convicted him." (quotations omitted)), <u>cert. denied</u>, 133 S. Ct. 2864 (2013); <u>Murden</u> v. <u>Artuz</u>, 497 F.3d 178, 194 (2d Cir. 2007) ("'To demonstrate actual innocence a habeas petitioner must show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence.' This requires 'a stronger showing' than the showing of prejudice necessary to prevail on an ineffective assistance claim. Actual innocence requires 'not legal innocence but factual innocence.'") (citations omitted)), <u>cert. denied</u>, 552 U.S. 1150, 128 S. Ct. 1083 (2008).

Gilford has not presented any evidence, new or otherwise, that would allow the court to find "'it is more likely than not that no reasonable juror would have convicted him.'" <u>Sweet</u> v. <u>Bennett</u>, 353 F.3d at 141 (quoting <u>Bousley</u> v. <u>United States</u>, 523 U.S. at 623, 118 S. Ct. at 1611); <u>see also</u>, <u>e.g.</u>, <u>Dominique</u> v. <u>Artus</u>, 25 F. Supp. 3d 321, 332 (E.D.N.Y. 2014) ("'Petitioner does not rely on or present any "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence," that was not presented at trial.'"); <u>Grant</u> v. <u>Bradt</u>, 10 Civ. 394, 2012 WL 3764548 at *5 (S.D.N.Y. Aug. 30, 2012) ("[B]ecause [petitioner] has offered no new evidence as to his innocence that was not presented at trial, the Court finds that [he] has failed to demonstrate the actual innocence necessary to satisfy the fundamental miscarriage of justice exception.").

**B.** **Application Of The State Procedural Bar Was Not Exorbitant**

"Ordinarily, violation of 'firmly established and regularly followed' state rules . . . will be adequate to foreclose review of a federal claim. There are, however, exceptional cases in which exorbitant application of a generally sound rule renders the state ground inadequate to stop consideration of a federal question." <u>Lee</u> v. <u>Kemna</u>, 534 U.S. 362, 376, 122 S. Ct. 877, 885 (2002) (citations omitted). The Supreme Court noted three factors to consider in determining whether a

"case falls within the small category of cases in which asserted state grounds are inadequate to block adjudication of a federal claim." <u>Lee</u> v. <u>Kemna</u>, 534 U.S. at 381, 122 S. Ct. at 888.  As summarized by the Second Circuit, the three factors are:

> (1) whether the alleged procedural violation was actually relied on in the trial court, and whether perfect compliance with the state rule would have changed the trial court's decision; (2) whether state caselaw indicated that compliance with the rule was demanded in the specific circumstances presented; and (3) whether petitioner had "substantially complied" with the rule given "the realities of trial," and, therefore, whether demanding perfect compliance with the rule would serve a legitimate governmental interest.

<u>Cotto</u> v. <u>Herbert</u>, 331 F.3d 217, 240 (2d Cir. 2003).[27/]  While not a test to determine the adequacy of a state procedural bar, these factors should be used "as guideposts in 'evaluat[ing] the state interest in a procedural rule against the circumstances of a particular case.'"  <u>Cotto</u> v. <u>Herbert</u>, 331 F.3d at 240 (quoting <u>Lee</u> v. <u>Kemna</u>, 534 U.S. at 381-85, 122 S. Ct. at 888-90).[28/]

Under the factors enumerated in <u>Cotto</u> v. <u>Herbert</u>, 331 F.3d at 240, Justice Cirigliano's application of C.P.L. § 440.10(2)(c) was not exorbitant under the circumstances.  Under the first <u>Cotto/Kemna</u> factor, it is clear from the face of the opinion that Justice Cirigliano "actually relied," <u>Cotto</u> v. <u>Herbert</u>, 331 F.3d at 240, on the alleged procedural violation in denying Gilford's claim.  (<u>See</u> page 16 above.)  This factor points to a finding of adequacy under the circumstances.

---

[27/]   <u>Accord</u>, <u>e.g.</u>, <u>Donaldson</u> v. <u>Ercole</u>, No. 06-5781, 2009 WL 82716 at *1-2 (2d Cir. Jan. 14, 2009); <u>Clark</u> v. <u>Perez</u>, 510 F.3d 382, 391 (2d Cir.), <u>cert. denied</u>, 555 U.S. 823, 129 S. Ct. 130 (2008); <u>Garvey</u> v. <u>Duncan</u>, 485 F.3d 709, 714 (2d Cir. 2007).

[28/]   <u>Accord</u>, <u>e.g.</u>, <u>Donaldson</u> v. <u>Ercole</u>, 2009 WL 82716 at *1; <u>Clark</u> v. <u>Perez</u>, 510 F.3d at 391; <u>Garvey</u> v. <u>Duncan</u>, 485 F.3d at 714.

The second factor, whether state law "indicated that compliance with the rule was demanded in the specific circumstances," Cotto v. Herbert, 331 F.3d at 240, also points toward a finding of adequacy.  Under New York law, if an ineffective assistance of counsel claim is based on matters outside the record, it is appropriately made on a collateral motion under C.P.L. § 440.10. See, e.g., People v. Harris, 109 A.D.2d 351, 360, 491 N.Y.S.2d 678 (2d Dep't 1985) (trial record insufficient to resolve petitioner's allegation that trial counsel gave faulty legal advice).  Where a claim can be resolved on the face of the record, however, the well-settled rule in New York is that it should be brought on direct appeal.  See, e.g., Holland v. Irvin, 45 F. App'x 17, 20 (2d Cir. 2002) ("[W]here, as here, the facts underlying the defendant's ineffective assistance claim are on the record and defendant has different counsel on appeal, New York courts require the defendant to make his ineffective assistance claim on appeal."); McDowell v. Heath, 09 Civ. 7887, 2013 WL 2896992 at *4 (S.D.N.Y. June 13, 2013) ("Record-based ineffective assistance of trial counsel claims . . . may be brought on direct appeal and when a petitioner fails to do so, rejection by a section 440.10 court is an independent and adequate ground precluding the petitioner from bringing the claim in a federal habeas petition.").[29]

---

[29]    See also, e.g., People v. Cooks, 67 N.Y.2d 100, 104, 500 N.Y.S.2d 503, 505 (1986); People v. Jossiah, 2 A.D.3d 877, 877, 769 N.Y.S.2d 743, 743 (2d Dep't 2003) ("The . . . record, however, clearly presented sufficient facts from which the defendant could have raised his present claims that his trial counsel was ineffective for failing to expressly raise the . . . issue.  Since this issue could have been raised on direct appeal, it could not be raised on the CPL 440.10 motion."); People v. Skinner, 154 A.D.2d 216, 221, 552 N.Y.S.2d 932, 934-35 (1st Dep't 1990) ("With respect to defendant's constitutional arguments, because defendant had actual preappeal knowledge of Note 9, they could have been briefed and argued on his direct appeal. Having failed to do so, defendant no longer has these arguments available to him for us[e] in his belated attack upon the conviction after final affirmance on appeal." (fn.
(continued...)

Gilford's claim that trial counsel was ineffective for failing to renew motions to dismiss certain counts of the indictment (Dkt. No. 1: Pet. Br. at 13) or make appropriate objections at trial (Pet. Br. at 14) could have been resolved on the face of the trial record.  See, e.g., Beauharnois v. Chappius, No. 12-CV-1283, 2015 WL 893091 at *14 n.7 (N.D.N.Y. Mar. 2, 2015); Garcia v. Lee, 10 Civ. 5287, 2012 WL 3822137 at *20 (S.D.N.Y. Aug. 28, 2012), report & rec. adopted, 2014 WL 406209 (S.D.N.Y. Feb. 3, 2014); Baxter v. Conway, 07 Civ. 2759, 2011 WL 5881846 at *3-4 (S.D.N.Y. July 29, 2011), report & rec. adopted, 2011 WL 5881190 (S.D.N.Y. Nov. 23, 2011); Jones v. Fischer, No. 05-CV-24, 2006 WL 2583206 *5 (E.D.N.Y. Sept. 6, 2006).  Thus, the second Cotto/Kemna factor also weighs against him.

Finally, the third Cotto/Kemna factor, which asks whether Gilford "substantially complied" with the state procedural rule, also weighs against him.  Gilford's failure to raise the record-based ineffective assistance claims on direct appeal where he was represented by new counsel (see page 13 above) was in contravention to C.P.L. § 440.10(2)(c).  Furthermore, demanding compliance with C.P.L. § 440(2)(c) serves the legitimate government interest of preventing "'[Section] 440.10 from being employed as a substitute for direct appeal when [the] defendant was in a position to raise an issue on appeal . . . or could readily have raised it on appeal but failed to do so.'"  Sweet v. Bennett, 353 F.3d 135, 139 (2d Cir. 2003) (quoting People v. Cooks, 67 N.Y.2d at 103, 500 N.Y.S.2d at 505).

---

29/      (...continued)
       omitted)).

        Accordingly, Gilford's ineffective assistance of counsel claim is procedurally barred from habeas review.[30/]

---

[30/]    In any event, Gilford's ineffective assistance claim lacks merit.  A claim for ineffective assistance of counsel is evaluated pursuant to the standard set forth in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984).  To establish ineffective assistance, a defendant must (1) show that counsel's representation "fell below an objective standard of reasonableness," and (2) "affirmatively prove prejudice" by establishing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland v. Washington, 466 U.S. at 688, 693–94, 104 S. Ct. at 2064, 2067-86; see also, e.g., Carmichael v. Chappius, 14 Civ. 10012, 2015 WL 4385765 at *18-20 (S.D.N.Y. July 17, 2015) (& cases cited therein).

        Gilford asserts that counsel was ineffective for "failure to renew motion to dismiss counts of indictment charging murder and assault first degree on grounds that evidence presented to grand jury was insufficient to support those counts and presentation of false and misleading evidence to grand jury rendered proceedings defective."  (Pet. Br. at 13-14.)  Gilford's counsel moved at the close of the prosecution's case to dismiss the second degree murder charge as to James and at the close of all evidence to dismiss the depraved indifference murder and second degree manslaughter charges as to James.  (See page 12 above.)  Further, at the time of sentencing, Gilford's counsel moved to set aside the verdict on the manslaughter count as to James and on the assault count as to Williams.  (See page 13 above.)  Thus, Gilford's assertion that counsel did not move to dismiss those counts is factually inaccurate.  Further, while Gilford may disagree with the timing of counsel's "mid-trial" notice as to the "prosecution's change of theory concerning the murder weapon" (Pet. Br. at 14), disagreements over strategic decisions such as the timing of motions and objections do not support a claim of ineffective assistance.  See, e.g., Bierenbaum v. Graham, 607 F.3d 36, 51 (2d Cir. 2010) (court "'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.'" (quoting Strickland v. Washington, 466 U.S. at 689, 104 S. Ct. at 2065)), cert. denied, 562 U.S. 1303, 131 S. Ct. 1693 (2011); United States v. Suri, 09 Cr. 1190, 2014 WL 3928605 at *7 (S.D.N.Y. Aug. 11, 2014) ("The decision to file pretrial motions is left to the sound discretion of counsel, not the defendant."); Lewin v. Ercole, 05 Civ. 10339, 2012 WL 2512016 at *6 (S.D.N.Y. June 28, 2012) (failure to raise objection may have been sound trial strategy and does not constitute ineffective assistance); Reyes v. Smith, No. 06-CV-3673, 2009 WL 3734911 at *12 (E.D.N.Y. Nov. 2, 2009) ("[a]s there are numerous ways to provide effective assistance in any given case, simple disagreements over trial strategies and tactics are insufficient to

(continued...)

**CONCLUSION** [31/]

For the reasons discussed above, Gilford's petition for habeas corpus should be DENIED in its entirety, and a certificate of appealability should not be issued.

**FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION**

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections.  See also Fed. R. Civ. P. 6.  Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Andrew L. Carter, 40 Foley Square, Room 435, and to my chambers, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge Carter (with a courtesy copy to my chambers).  Failure to file objections will result in a waiver of those objections for purposes of appeal.  Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466 (1985); Ingram v. Herrick, 475 F. App'x 793, 793 (2d Cir. 2012); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d

---

[30/]      (...continued)
establish ineffectiveness.").  Accordingly, Gilford has not demonstrated that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, as is required by Strickland v. Washington.

Additionally, because Gilford was found guilty after a trial, he cannot establish that any alleged deficiencies in the grand jury proceedings prejudiced him, and thus is unable to satisfy Strickland's prejudice prong.  See, e.g., Bowman v. Racette, 12 Civ. 4153, 2015 WL 1787130 at *17 (S.D.N.Y. Apr. 20, 2015) ("A jury verdict of guilty beyond a reasonable doubt suffices to overcome errors at the indictment stage." (collecting cases)); Rodriguez v. Lee, 13 Civ. 4353, 2013 WL 6036435 at *8 (S.D.N.Y. Nov. 13, 2013) (Peck, M.J.).

[31/]      If Gilford requires copies of any of the cases reported only in Westlaw, he should request copies from the State's counsel.  See Lebron v. Sanders, 557 F.3d 76, 79 (2d Cir. 2009); SDNY-EDNY Local Civil Rule 7.2.

50

1049, 1054 (2d Cir. 1993), <u>cert. denied</u>, 513 U.S. 822, 115 S. Ct. 86 (1994); <u>Frank</u> v. <u>Johnson</u>, 968

F.2d 298, 300 (2d Cir. 1992), <u>cert. denied</u>, 506 U.S. 1038, 113 S. Ct. 825 (1992); <u>Small</u> v. <u>Sec'y of</u>

<u>Health & Human Servs.</u>, 892 F.2d 15, 16 (2d Cir. 1989); <u>Wesolek</u> v. <u>Canadair Ltd.</u>, 838 F.2d 55,

57-59 (2d Cir. 1988); <u>McCarthy</u> v. <u>Manson</u>, 714 F.2d 234, 237-38 (2d Cir. 1983).

Dated:      New York, New York
            August 5, 2015

                              Respectfully submitted,

                              _____
                              **Andrew J. Peck**
                              United States Magistrate Judge


Copies to:    Terell Gilford (mail)
              Melanie Sarver (ECF)
              Judge Andrew L. Carter (ECF)